**Timothy RYAN, Plaintiff,**

v.

**BURLINGTON COUNTY, NEW JERSEY, Harold Colburn, Jr., Individually and collectively as the Burlington County Board of Chosen Freeholders; Michael J. Conda, Individually and collectively as the Burlington County Board of Chosen Freeholders; Catherine A. Costa, Individually and collectively as the Burlington County Board of Chosen Freeholders; Henry J. Metzger, Individually and collectively as the Burlington County Board of Chosen Freeholders; Robert C. Shinn, Jr., Individually and collectively as the Burlington County Board of Chosen Freeholders; John Bradman, Individually and officially as Warden of Burlington County Jail; Ed Pierce, Captain, Burlington County Jail; Ken Horton, Sergeant, Burlington County Jail; Roosevelt McKinney, Correction Officer, Burlington County Jail; Lewis Speight, Correction Officer, Burlington County Jail; Mike Polis, Correction Officer, Burlington County Jail; Richard Lightsey, Correction Officer, Burlington County Jail; Tim Flournoy, Correction Officer, Burlington County Jail; Guard Adams, Correction Officer, Burlington County Jail; Guard Gorham, Correction Officer, Burlington County Jail; William H. Fauver, Individually and as Commissioner of the New Jersey Department of Corrections; and John Call, Individually and as Deputy Director of the Division of Adult Institutions in New Jersey, Defendants.**

Civ. A. No. 85–2002 (MTB).

United States District Court,
D. New Jersey,
Civil Division.

March 6, 1989.

Slimm, Dash and Goldberg, Westmont, N.J., by Kurt Denke, Joseph Goldberg, for plaintiff.

Rand, Algeier, Tosti & Woodruff, P.C., Morristown, N.J. by Robert M. Tosti, for defendants Burlington County Board of

Chosen Freeholders, Colburn, Conda, Costa, Metzger, and Shinn.

Parker, McCay & Criscuolo, P.C., Marlton, N.J. by Jeffrey D. Schaffer, for defendants Gorham, Polis, Speight, McKinney, Adams, Pierce, Horton, Flournoy, Lightsey and Bradman.

OPINION

BARRY, District Judge.

## I. INTRODUCTION

The events which led to the grievous injuries suffered by plaintiff Timothy Ryan on October 4, 1983 have been fully set forth in my earlier opinion, *Ryan v. Burlington County*, 674 F.Supp. 464 (D.N.J. 1987), and will be but briefly summarized here. The locus of those events was the Burlington County Jail, a facility which it is undisputed was sorely lacking in a number of critical respects.

The Burlington County Jail is a small two-story structure which had previously been used as an armory. The first floor, at times relevant here, consisted of dormitory housing, and the second floor consisted of six dormitory cells and four individual, maximum-security cells. *Id.* at 471. On April 20, 1977, and on March 28, 1978, two lawsuits were commenced by inmates of the jail asserting that the jail conditions violated the laws of New Jersey and the Constitution of the United States. In response to those cases (referred to collectively as *"Vespa"*), the Board of Chosen Freeholders of Burlington County (hereinafter "Board") retained the services of a corrections expert, and both the expert and Michael Hogan, the Assistant County Solicitor, recommended that the Board attempt to settle the cases. *Id.* Because the Sheriff, who was the administrator of the jail, refused to sign the proposed *Vespa* consent decree, the Board, on May 13, 1981, adopted a resolution assuming jurisdiction, custody, and control of the jail. *Id.* at 472. The *Vespa* settlement was approved by the Honorable Dickinson R. Debevoise on June 1, 1981.

The *Vespa* consent decree did not contain an admission on defendants' part that plaintiffs' constitutional rights had been violated. It required, however, that no more than 117 inmates were to be housed at the jail on any given day, "except in emergencies," and a maximum of eight inmates were to be placed in cell 208. *Id.* It also required that defendants implement, by September 1981, a classification system whereby inmates would be reviewed within sixty days of their admission to determine where they should be housed within the jail. Moreover, by June 1983, the jail was to have an "inmate reception area" and eight detention rooms for the purpose of classifying incoming inmates. *Id.* The consent decree also included numerous provisions for other alterations in the jail's physical plant and administration, such as adequate lighting, heating, and plumbing, and a law library.

The day after the entry of the *Vespa* consent decree, then-Governor of New Jersey Brendan T. Byrne signed Executive Order ("E.O.") No. 106. The order was designed to relieve the problem of overcrowding in the state and county prisons, and it directed that William Fauver, the Commissioner of the Department of Corrections ("D.O.C."), be given the authority to designate the place of confinement of all state *and* county inmates. *Id.* at 468–69. The Supreme Court of New Jersey upheld the validity of E.O. 106 in *Worthington v. Fauver*, 88 N.J. 183, 440 A.2d 1128 (1982), observing that the centralization of authority for the allocation of prisoners among state and county institutions was rationally related to the goal of alleviating overcrowding in those institutions. *Id.* at 469–70.

E.O. 106 had an immediate adverse effect upon the overcrowding problem at Burlington County Jail. Between July 1981 and February 1982, the average daily population at the jail was 157 inmates, and over the following year the average population was 147 inmates. *Id.* at 474. Between September 15 and October 7, 1983, the number of inmates ranged from 128 to 165, with an average daily population of 147 inmates, *id.;* accordingly, during this peri-

od the *Vespa* inmate cap of 117 inmates was never met. The *Vespa* requirements of a classification system and of minimum floor area per inmate had, similarly not been met by October 1983.

On September 30, 1983, plaintiff Timothy Ryan was placed into custody at Burlington County Jail after having been arrested for a motor vehicle violation.[1] He was assigned to cell 208, which already housed nine inmates, one more than permitted by the *Vespa* decree. Four days later, while breakfast was being served in the cells, plaintiff was attacked by a fellow inmate, Maurice Scott. *Id.* at 466. Scott, who had been awaiting transfer to a state prison as a parole violator, had most recently been convicted of the receipt of stolen property. *See* Knox Aff., Exh. S. While at the Burlington County Jail, Scott had been involved in several violent attacks on fellow inmates 674 F.Supp. at 466. As a result of the attack by Scott, plaintiff suffered a broken neck and was rendered quadriplegic.

In April 1985, plaintiff filed the instant lawsuit, seeking compensatory and punitive damages under 42 U.S.C. §§ 1983, 1985 and under pendent state law causes of action. The named defendants were William Fauver; Joseph G. Call, Deputy Director of the Division of Adult Institutions; Michael Hogan; the Board and its individual members (collectively referred to as "Board defendants"); Warden John Bradman; Captain Edgar Pierce; Sergeants William Adams and Kenneth Horton; and Corrections Officers Harry Gorham, Michael Polis, Richard Lightsey, Lewis Speight, Roosevelt McKinney, and Timothy Flournoy (collectively referred to as "Jail defendants"). In my opinion of November 9, 1987, I dismissed plaintiff's § 1985 claim, his § 1983 claims predicated upon the Fourth, Fifth, and Eighth Amendments, and his claims against Fauver and Call in their official capacities. I also granted Hogan's motion for summary judgment on the ground of qualified immunity, while rejecting Fauver and Call's motions for identical relief. I

rejected, as well, Fauver and Call's claim that plaintiff's complaint did not state a cognizable § 1983 claim and their claim that their actions did not affirmatively cause the injuries to plaintiff. Plaintiff has subsequently dismissed his § 1985 claims and his pendent state law claims, the latter barred by N.J.S.A. 59:5–2(b)(4).

Presently before me are two sets of summary judgment motions. Both the Board defendants and the Jail defendants seek judgment in their favor on the ground that they are entitled to qualified immunity, and on the ground that their actions were at most negligent and do not subject them to § 1983 liability. The Board defendants also move for summary judgment on the basis of absolute legislative immunity. Decision on these motions was held in abeyance pending the review of my November 1987 opinion by the Court of Appeals for the Third Circuit, and were renewed after that decision was affirmed. *See Ryan v. Burlington County*, 860 F.2d 1199 (3d Cir. 1988).

For the reasons that follow, the Board defendants' motion for summary judgment will be denied in full. Similarly, the Jail defendants' motion will be denied, except that judgment will be ordered in favor of the corrections officers on the ground of qualified immunity.

## II.  DISCUSSION

### A.  *Qualified Immunity*

■ The defense of qualified immunity serves to insulate a governmental official from liability in civil damages when the discretionary conduct of that official "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Lee v. Mihalich*, 847 F.2d 66, 69 (3d Cir.1988). The judicially-created doctrine balances the interest in vindicating constitutional rights which have been violated by public officials

---

**1.** Ryan was held because he could not post bail for his past traffic violations. *Ryan v. Burling-*

*ton County,* 860 F.2d 1199, 1201 (3d Cir.1988).

against the interest in allowing public officials to perform their discretionary duties without fear of disruptive lawsuits and personal liability in money damages. *Hynson v. City of Chester*, 864 F.2d 1026, 1031 (3d Cir.1988); *see Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). Summary judgment in favor of a defendant on the ground of qualified immunity is to be denied if a jury could find that the defendant could not reasonably have believed that his actions were lawful, and is to be granted if a jury could not find that the defendant's belief in the lawfulness of the challenged actions was unreasonable. *Lee,* 847 F.2d at 69. It is the objective reasonableness of a defendant's actions that governs; what the defendant actually believed or did not believe is irrelevant to the qualified immunity analysis. *Anderson,* 107 S.Ct. at 3040.

The Supreme Court of the United States has provided the following definition of a "clearly established right":

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has been declared unlawful, but it is to say that in the light of the preexisting law the unlawfulness must be apparent.

*Id.* at 3039 (citations omitted). The Third Circuit has required "some but not precise factual correspondence" between the relevant caselaw and the challenged conduct, and has required that officials "apply general, well developed legal principles." *Stoneking v. Bradford Area School District,* 856 F.2d 594, 599 (3d Cir.1988) (citations omitted). In determining whether caselaw evidenced a clearly established right, courts are to examine the state of the law as of the time of the challenged conduct rather than the time at which the qualified immunity defense is raised. *Lee,* 847 F.2d at 69. Finally, although the public official asserting the defense of qualified immunity bears the burden of pleading and proof, *Kovats v. Rutgers,* 822 F.2d 1303, 1313 (3d Cir.1987), a plaintiff may overcome the official's asserted defense only by demonstrating that his or her clearly established rights were violated by that official. *Hynson v. City of Chester,* 827 F.2d 932, 935 (3d Cir.1987).

In my earlier opinion in this matter, I noted two of plaintiff's constitutional rights that were clearly established as of October 1983. First, based upon *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and *Union County Jail Inmates v. DiBuono,* 713 F.2d 984 (3d Cir. 1983), plaintiff had the right, as a pretrial detainee, to be free from overcrowded conditions that amounted to the imposition of punishment. *Ryan,* 674 F.Supp. at 476–77. Second, *Jones v. Diamond,* 636 F.2d 1364 (5th Cir.1981), among other cases, established for pretrial detainees "a constitutional right to be housed separately from known dangerous convicted inmates who pose a threat to their personal security unless physical facilities do not permit their separation." *Id.* at 477–78. With respect to the former right, I found that the overcrowded conditions at Burlington County Jail, when viewed in the light most favorable to plaintiff, would support a finding that plaintiff had been unconstitutionally subjected to punishment; with respect to the latter right, I found that a reasonable jury could conclude from the evidence that classification of inmates was possible at the Burlington County Jail in October 1983. *Id.* at 476–78. Defendants are not free to contest these legal and factual findings in their present motions.

To these two clearly established constitutional rights I now add a third: plaintiff's right to be housed in a reasonably safe prison environment. In the context of a suit alleging sexual assault by a school teacher upon a female student, the Third Circuit found a clearly established right in the student to be protected, by the school authorities, from harm caused by the actions of third parties such as teachers. *Stoneking,* 856 F.2d at 603–04. In so finding, the court explicitly observed that

> [t]here was substantial authority by 1979 that state officials have a duty to protect institutionalized persons from self-injury

or assault by fellow inmates and staff, and holding that a prisoner has a constitutional right to a safe environment and that the prison officials have a corresponding duty to reasonably insure that safe environment to prisoners.

*Id.* at 603 n. 14; *see Curtis v. Everette,* 489 F.2d 516, 518 (3d Cir.1973) (prison officials' failure to restrain inmate who attacked plaintiff provided basis for valid § 1983 claim against officials), *cited in Davidson v. O'Lone,* 752 F.2d 817, 821 (3d Cir.1984) (*en banc*), *aff'd sub nom. Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). The existence of this right was further manifested by the holding in *Youngberg v. Romeo,* 457 U.S. 307, 315, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982), that state officials were liable under § 1983 for their failure to take all reasonable steps necessary to prevent the plaintiff, an involuntarily committed resident of a mental institution, from being injured by fellow inmates. *See Stoneking,* 856 F.2d at 603 n. 14 (citing *Youngberg* in finding that the female student's rights "were even more clearly established" by the date of her graduation in 1983).[2] Accordingly, I find that in October 1983 plaintiff enjoyed a constitutional right to a safe prison environment, which environment was required to have been reasonably ensured by the actions of those responsible for the maintenance and operation of the prison.

As I have previously observed, defendants' motions for summary judgment should be granted if a jury could not find that the defendants' belief in the lawfulness of the challenged actions was unreasonable. *Lee,* 847 F.2d at 69. In order to perform the requisite analysis, the information and options available to each set of defendants must be examined with respect to each of plaintiff's three clearly established constitutional rights. The reasonableness of defendants' responses to the situation at Burlington County Jail, in light of the available information and options, will determine whether or not summary judgment on the defense of qualified immunity is warranted.

### 1. Board of Chosen Freeholders

■ With respect to plaintiff's right to be free from overcrowding so severe as to constitute punishment, there is evidence of record from which a jury could reasonably conclude that the Board had before it information indicating extreme overcrowding at the Burlington County Jail. Each of the members of the Board has stated that he or she was aware of the overcrowding at the jail. *See* Costa Dep. 126:10–13, 131:14–17 (attached at Exh. C, Plaintiff's Appendix in Opposition to Board Defendants' Motion); Metzger Dep. 140:21–25 (attached at Exh. D); Conda Dep. 116:7–13, 21–23 (attached at Exh. A);[3] Shinn Dep. 61:9–24 (attached at Exh. E); Colburn Dep. 45:11–16 (attached at Exh. G). Moreover, the Board received copies of the D.O.C.'s annual in-

**2.** The Supreme Court has recently held, in *DeShaney v. Winnebago County Dep't of Social Services,* — U.S. —, 109 S.Ct. 998, 103 L.Ed. 2d 249 (1989), that no affirmative duty was placed upon social workers to protect a child from suspected parental abuse. In so holding, the Court found that, in contrast to the facts of *DeShaney,*

> when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, *and reasonable safety*—it transgresses the substantive limits on state action

set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* — U.S. at —, 109 S.Ct. at 1005–06 (emphasis added). In the course of its discussion, the Court cited *Youngberg,* 457 U.S. at 315–317, 102 S.Ct. at 2457–59, and *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976), thereby indicating that the duty (and corresponding right) to provide for a prisoner's reasonable safety was clearly established by 1983.

**3.** Conda also testified that it was his practice to not read any document over one page in length. Conda Dep. 73:6–9.

spection reports on the conditions at the Burlington County Jail, *see* Bradman Dep. 61:17–62:2 (attached at Exh. B, Plaintiff's Appendix in Opposition to Board Defendants' Motion), the last of which indicates that, from March 1, 1982 through February 15, 1983, the number of inmates at the jail fluctuated between 115 (only two below the *Vespa* cap) and 175, with a daily average of 147 inmates. *See* P–8 (D.O.C. County Jail Inspection Report, dated 2/16/83). The Board was also aware that overcrowding in a prison setting posed a danger of increased combativeness and aggression among the inmates. *See* Costa Dep. 173–15–20; Shinn Dep. 63:19–25; *see also* Report of Environmental Conditions in Burlington County Jail at 18 (attached at P–99) (inadequate living space may result in "violence, aggression and defense of territory" in inmates; prepared in course of *Vespa* litigation).

The Board's first response is that, although it may have known that the Burlington County Jail was overcrowded, that overcrowding was due entirely to the influx of state inmates, an influx, the Board was powerless to remedy. *See* Board Defendants' Reply Letter Brief of 1/29/88 at 4. This contention fails for two reasons. First, the jail records for the twenty days between September 15 and October 4, 1983 reveal that the Burlington County Jail would have complied with the *Vespa* cap of 117 inmates on only two days during that period, even had *no* state inmates been present; on ten of those days, the *Vespa* limit was exceeded by at least ten inmates, even when only county inmates are considered.[4] *See Ryan*, 674 F.Supp. at 474.

Second, and more important, the Board's argument suffers from the erroneous assumption that the Board is insulated from any liability arising from overcrowding which resulted from the presence of state inmates. The presence of state inmates would, indeed, insulate the Board if the only solution to the overcrowding would have been to refuse to accept the state inmates, a recourse which was not available to the Board.[5] However, there is evidence in the record that the Board had available to it means by which the overcrowding at the Burlington County Jail could have been lessened or eliminated, even given the presence of the additional state inmates. Pretrial detainees (such as plaintiff) or low-risk inmates could have been moved to the county's minimum-security prison at New Lisbon. *See* Expert Report of John Case, dated 9/8/86, at 9 (attached at Exh. N, Plaintiff's Appendix in Opposition to Board Defendants' Motion).[6] The Board, moreover, could have applied for prefabricated inmate housing units provided by the state; between 1981 and 1983, Ocean, Bergen, and Essex Counties received 48 such inmate bedspaces, Middlesex County received 24 bedspaces, and, in 1984, Hudson County received 160 bedspaces. Fauver Aff. ¶ 6 (attached at P–152).

Moreover, the Board chose not to accept state monies designated for the construction or rehabilitation of county jails under the state's county assistance program, notwithstanding the fact that seven other counties were provided with a total of 350 additional beds under the program. Fauver Aff. ¶ 10.[7] Finally, the Board chose

---

4. I accordingly cannot accept the Board defendants' assertion that, over this period, the jail would have either met or been close to the *Vespa* limit. *See* Board Defendants' Reply Letter Brief at 2.

5. There was, of course, the possibility of filing suit against the state to compel a transfer of the state prisoners from county to state jails, as had been successfully done by two counties prior to October 1983, and which was eventually done by Burlington County in 1985. *Ryan*, 674 F.Supp. at 475. However, having found that Hogan did not violate plaintiff's clearly established rights in advising against the filing of such a suit prior to October 1983, *see id.* at 481,

I cannot find that the Board violated those rights by following Hogan's advice.

6. There is one letter in the record indicating that Freeholder Conda sought to pursue this remedy. *See* P–18 (letter from Conda to Bradman, dated 11/10/81). There is no evidence either that Conda attempted to follow-up the warden's inaction concerning the suggestion, or that any other Board member (all of whom received copies of this letter) pursued this remedy.

7. By letter to Bradman dated October 4, 1982, Fauver offered assistance to Burlington County under the county assistance plan. *See* P–61.

not to renovate the Burlington County Jail by the *Vespa* deadline of June 1983 for the reason that renovation "would be impractical and too costly." Board Defendants' Reply Letter Brief at 2. Even assuming this to be true, a question remains as to the reasonableness of that determination in light of the totality of the conditions at the Burlington County Jail. *See Monmouth County Correctional Institutional Inmates v. Lanzaro,* 834 F.2d 326, 336–37 (3d Cir.1987) ("[W]here conditions within a prison facility are challenged as constitutionally inadequate, courts have been reluctant to consider costs to the institution a major factor in determining whether a constitutional violation exist[s]"); *Bounds v. Smith,* 430 U.S. 817, 825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977) ("[T]he cost of protecting a constitutional right cannot justify its total denial"). Thus, although the Board "had no control over the number of State inmates which were imposed [by E.O. 106] upon the [Burlington] county facility," Board Defendants' Reply Letter Brief at 4, the Board had at its disposal alternate means by which to alleviate the overcrowding, and it was the duty of the Board —which had assumed responsibility for the Burlington County Jail in 1981—to ensure that the jail was maintained in a constitutional manner.

The Board's next response to its asserted liability for the Burlington County Jail's overcrowded condition is that it acted in pursuit of "legitimate governmental interests that justified conditions at the jail." Board Defendants' Brief at 30. In particular, the Board points to two such interests: the interest in maintaining an effective incarceration system during a state-wide period of overcrowding, and the interest in building a new jail while "temporarily" operating the old facility so as to avoid an overly expensive renovation of the latter structure. *Id.* at 30–31.

As to the first interest, it is clear from the discussion above that the Board could have undertaken efforts to lessen the overcrowding problem, none of which efforts were attempted. With regard to the second interest, there is evidence from which a jury could conclude that financial considerations were not the motivating factor behind the Board's belated decision to build rather than to renovate. According to Warden Bradman, the Board "never told me the money was not available [and t]hat's why we're not doing this [i.e., renovation of the jail]," Bradman Dep. 61:11–12, and he was never given an explanation by the Board for its reluctance to renovate. *Id.* at 61:13–16. In addition, the documentation regarding the Board's decision not to renovate, including letters and a supplementation to the *Vespa* settlement agreement, nowhere mentions that the renovation would have been exorbitantly expensive. *See* Knox Aff., Exh. N. Moreover, even were financial considerations at the root of the Board's decision to undertake a cheaper, long-term solution rather than a more expensive, quicker solution to the overcrowding problem, it would remain for the jury to determine whether that decision was reasonable in view of the long-standing history of overcrowding at the Burlington County Jail.[8] *See Shabazz v. O'Lone,* 782 F.2d 416, 420 n. 3 (3rd Cir.1986) (*en banc*) (cost to state is relevant to determination of whether particular accommodation by prison of inmate's constitutional rights is reasonable).

Finally, the Board contends that it could not reasonably have known that its actions (or inaction) would violate plaintiff's clearly established right to be free from overcrowding on the theory that "research has

---

By letter dated October 20, 1982, Bradman declined the offer, and Freeholder Metzger was sent a copy of that letter. *See* P–62. There is no indication that the Board did not authorize or did not agree with Bradman's rejection of Fauver's offer, and the Board certainly made no attempt, after receipt of a copy of Bradman's letter, to reverse his decision refusing the state's offer of assistance.

**8.** The reasonableness of any decision made by the Board in light of financial constraints cannot be determined on this record. The Board defendants have submitted no evidence concerning the estimated costs of renovating the jail, the estimated costs of building a new one, or the full budget for Burlington County during the relevant period.

not disclosed any decision wherein individual freeholders were found liable to an inmate or detainee for the deprivation of a protected liberty interest." Board Defendants' Brief at 29; *see* Board Defendants' Supplemental Letter Brief of 1/9/89 at 4. As observed by both the Supreme Court and the Third Circuit, however, it is not necessary for the precise action (or the precise actors) challenged in a current lawsuit to have previously been found unlawful in order for a qualified immunity claim to be defeated. *See Anderson,* 107 S.Ct. at 3039; *Stoneking,* 856 F.2d at 599. In addition, the Board does not, and could not, argue that prior caselaw had not long held prison administrators individually liable for violations of an inmate's clearly established rights. By virtue of the Board's resolution of May 13, 1981, wherein it "assume[d] the jurisdiction, custody and control of the Burlington County Jail System," *see* Plaintiff's Reply Letter Brief of 1/19/89, Exh. A, the Board took ultimate responsibility for the administration of the jail, and thus should reasonably have surmised that the caselaw regarding prison administrators would be applied to its actions. The fortuity that no other group of freeholders has assumed control of a jail, been subject to a § 1983 suit as a result of the jail's operation, and been held individually liable in a reported opinion, does not require a different result.

With respect to plaintiff's second clearly established right—the right to be housed separately from known dangerous convicted inmates who pose a threat to personal security—there is sufficient evidence to support the conclusion that the Board was aware that no inmate housing classification system was, or ever had been, in place at the Burlington County Jail. The lack of such a classification system was noted during the *Vespa* litigation and in the state's annual inspection reports, which reports were provided to the Board. *See* Report of February 6, 1981 (P–17); Report of August 12, 1982 (P–16); Report of February 16, 1983 (P–8). The Board members contend, however, that they did not violate plaintiff's right to classification because that right is limited to a right to be housed separately from *known* dangerous convicted inmates, and the Board was not (and could not have been) aware that known dangerous convicted inmates were being placed in cells with pretrial detainees.[9] *See* Board Defendants' Reply Letter Brief at 6.

The Board, however, misconceives the nature of plaintiff's right to classification by narrowly interpreting the language of my earlier opinion. The right possessed by plaintiff as of October 1983 was not simply a right to be housed separately from known dangerous inmates. Rather, it was a right to a classification system that would identify those dangerous inmates and place them in housing separate from pretrial detainees such as plaintiff. Certainly, that was the right recognized by *Jones v. Diamond, supra,* upon which this Court and the Third Circuit relied in determining plaintiff's clearly established rights. *See* 674 F.Supp. at 477; 860 F.2d at 1204.

Moreover, the Board's reading would lead to an anomalous result. Under its reading, prison authorities could (and here did) fail to establish a classification system, which system would have identified dangerous inmates, and then contend that they are not liable for inmate assaults because they did not know that the assaulting inmate was dangerous. Plaintiff necessarily possessed both a right to be housed separately from dangerous inmates and a right to a classification system that would achieve that result. That the Board failed to institute the classification system, and thereby failed to identify Maurice Scott as dangerous, does not entitle it to qualified immunity.

There is also evidence in the record to support a finding that the Board violated plaintiff's third clearly established right, the constitutional right to a safe prison environment. As observed by the Third Circuit, this right imposes upon prison authorities "a corresponding duty to reasonably insure that safe environment to pris-

---

**9.** The Board defendants do not concede that dangerous convicted inmates were housed with pretrial detainees, nor do they concede that Scott was a dangerous convicted inmate. *See* Board Defendants' Reply Letter Brief at 6.

oners." *Stoneking*, 856 F.2d at 603 n. 14. Numerous courts have held that insufficient security staffing may result in a deprivation of the constitutionally-mandated safe prison environment. *See Williams v. Edwards*, 547 F.2d 1206, 1213 (5th Cir. 1977); *Finney v. Mabry*, 534 F.Supp. 1026, 1038 (E.D.Ark.1982); *Ruiz v. Estelle*, 503 F.Supp. 1265, 1303 (S.D.Tex.1980); *Owens–El v. Robinson*, 442 F.Supp. 1368, 1385 (W.D.Pa.1978).

Warden Bradman testified in his deposition that each year from 1981 through 1985 he requested funds for additional security personnel from the Board. Bradman Dep. 48:20–23. In particular, Bradman requested the addition of one training sergeant and four corrections officer positions on August 27, 1981, *see* Exh. M to Plaintiff's Appendix in Opposition to Board Defendants' Motion at 2; the addition of two corrections officer positions on October 7, 1981, *id.* at 6; and the addition of ten corrections officer positions on May 10, 1982.[10] *Id.* at 15. On October 29, 1982, Bradman again requested ten additional corrections officers, noting in a memo to the Board that "[p]resent minimum requirements for officers per shift is not adequate to maintain the necessary levels of safety and custody for officers, employees and inmates within the facility." Bradman Dep. 49:24–50:2; *see also* Exh. M at 16 (Bradman memo to Board of August 10, 1982, noting that "there is currently a substantial shortage of Correction Officers assigned" at the jail). In response to these requests for additional corrections officers, the Board authorized the hiring of three additional corrections officers in 1984. *See* Bradman Dep. 51:4–21. As for the midnight to 8 a.m. shift, during which shift plaintiff was attacked, the warden's request for two additional officers was not granted until January 1984, so that Bradman considered the shift to have been understaffed as of October 1983. *Id.* at

55:23–56:14. A jury could conclude from this evidence that the Board could not have reasonably believed that its refusal to supply Burlington County Jail with additional security personnel, when the warden of the jail requested the personnel as necessary for the security of the inmates, was lawful, in view of the inmates' right to a secure environment.[11] As such, the Board defendants are not entitled to summary judgment as to this claim on the ground of qualified immunity.

### 2. *Jail Defendants*
#### a. *Bradman and Pierce*

Bradman was hired by the Board after the Board assumed control of the Burlington County Jail by resolution dated May 13, 1981. *See* Conda Dep. 15:24–25. As warden, Bradman was responsible for the day-to-day operation of the jail. *See id.;* Jail Defendants' Brief at 5. Pierce held the position of captain as of October 1983, and advised and assisted the warden in setting weekly schedules, in formulating rules and regulations for security and for operating the jail, and generally in the administration of the jail on a daily basis. *See* Pierce Dep. 19:11–20:9 (attached at Exh. A, Plaintiff's Appendix in Opposition to Jail Defendants' Motion); Jail Defendants' Brief at 3. In sum, Warden Bradman had the authority to alter the day-to-day operation of the jail in any manner in which he saw fit, and Captain Pierce had the responsibility of advising and assisting Warden Bradman with respect to the operation of the jail. It is in light of these powers and responsibilities that Bradman and Pierce's defense of qualified immunity must be examined.

■ Insofar as plaintiff's right to be free from overcrowding is concerned, both Bradman and Pierce were aware of the overcrowded conditions at Burlington County Jail. *See* Bradman Dep. 31:23–32:8 (attached at Exh. A, Plaintiff's Appendix in Opposition to Jail Defendants' Motion);

---

**10.** The May 10 request is especially significant for it sought funding for a doubling of the number of officers patrolling the second floor of Burlington County Jail. As noted, plaintiff's cell was on that floor.

**11.** Its obligation to provide the Burlington County Jail with sufficient staffing was clearly recognized by the Board. *See* Conda Dep. 15:12–15 ("we were to provide the facility and the proper staff to operate it").

Pierce Dep. 81:22–24. Warden Bradman had at his disposal at least two avenues by which the overcrowding could have been lessened: he could have aggressively sought to transfer minimum-security prisoners and pretrial detainees to the minimum-security New Lisbon facility, *see* Case Expert Report at 9, and he could have accepted, rather than rejected, the state's offer of monies for renovating or constructing jails under the county assistance program. *See infra* n. 6 and P–62. Thus, as with the Board, Bradman's contention that E.O. 106 vested sole authority in Commissioner Fauver to deal with the placement of state inmates (*see* Jail Defendants' Reply Letter Brief at 4) cannot support his qualified immunity defense, for a jury could conclude that the warden neglected to attempt available solutions to the overcrowding at Burlington County Jail. As such, he is not entitled to summary judgment regarding this claim.[12]

■ Both Bradman and Pierce knew that the Burlington County Jail had not instituted any classification system as of October 1983, and they do not contest that knowledge. I have previously found a factual dispute as to whether the physical plant of the Burlington County Jail permitted classification in October 1983. *See Ryan,* 674 F.Supp. at 478. Warden Bradman had the authority to require that a classification system be instituted; Captain Pierce had the responsibility of advising and assisting Warden Bradman in setting the procedure and rules which would govern the daily administration of the jail. On the record before me, neither Bradman nor Pierce took any action whatsoever in an attempt to establish a system of classification at the Burlington County Jail. I cannot say that a jury, on these facts, would be obliged to find that Bradman and Pierce's belief that their actions were lawful was reasonable, and thus a qualified immunity defense has not been established.

■ Finally, Bradman and Pierce were also responsible for taking reasonable measures to ensure that a safe prison environment existed at Burlington County Jail. All Jail defendants (including Bradman and Pierce) concede, for purposes of these motions, that they were aware that Scott had been involved in prior fights during his incarceration.[13] *See* Jail Defendants' Reply Letter Brief at 3. Moreover, a jury could find that the frequency with which fights occurred during mealtimes, *see* Horton Dep. 114:3–8 (attached at Exh. C, Plaintiff's Appendix in Opposition to Jail Defendants' Motion); Polis Dep. 37:20–38:7 (attached at Exh. H); Lightsey Dep. 34:10–13 (attached at Exh. I): Speight Dep. 123:1–2, 15–17 (attached at Exh. J), was a condition that was or should have been known to Bradman and Pierce, as the chief administrators of the jail. With this knowledge, Bradman and Pierce failed to designate Scott as a state inmate to be transferred back to a state institution, *see* Cooper Dep. 52:20–53:3 (attached at Exh. X) (Cooper, Bradman, and Pierce could designate any state inmate for transfer to a state prison), even though approximately twenty state inmates were transferred from the Burlington County Jail to state prisons during the period of Scott's incarceration. *See* P–66, at 9–11. They also failed to have at least one corrections officer assigned to roam the second floor during mealtimes and to

12. I find that Captain Pierce is entitled to summary judgment as to this claim. There is no evidence that he was consulted by Bradman regarding any possible solutions to the overcrowding problem, and he is not mentioned by expert Case as having neglected solutions to the problem. Moreover, his name does not appear on Bradman's letter to Fauver of October 1982, in which letter Bradman rejected participation in the county assistance plan.

13. Prison officials at the jail knew, or should have known, that Scott had been arrested seven times between 1978 and 1983 on 27 charges of, *inter alia,* burglary, larceny, and assault, *see* Case Report at 13; that he owed money to the Violent Crime Compensation Board, indicating that he had committed a crime causing serious injury to another individual, *id.* at 13–14; that he had, during his time at the Burlington County Jail, been involved in an incident in which an inmate suffered a broken nose, Polis Dep. 64:11–17, and in at least three other incidents, Lightsey Dep. 58:4–8; and that he was known to have harassed white inmates. *Id.* at 59:16–22; Butler Aff. at 2 (attached at Exh. V to Plaintiff's Appendix in Opposition to Jail Defendants' Motion).

monitor the cells, as opposed to having all three officers serve meals in the cells at the same time. Given the frequency of mealtime fights, and given that activity in one cell could not be heard by officers in another cell, *see* Flournoy Dep. 42:21–25 (attached at Exh. M), Bradman and Pierce should reasonably have known that security arrangements on the second floor of Burlington County Jail during October 1983 were deficient.[14] *See* Case Expert Report at 10.

### b. *Sergeants Adams and Horton*

■ Plaintiff does not appear to contend that Sergeants Horton and Adams had any authority to remedy the overcrowding situation at the Burlington County Jail. *See* Plaintiff's Brief at 25–27. Moreover, they lacked the authority to institute a classification system, even though each attempted to undertake inmate classification on an *ad hoc* basis. *See* Horton Dep. 114:9–11, 14–18; 115:7–11 (classified inmates according to nature of charges, appearance, and available space); Adams Dep. 10:17–25 (attached at Exh. D, Plaintiff's Appendix in Opposition to Jail Defendants' Motion) (inmates charged with "serious crime[s]" would be placed in individual cell; all others housed according to availability of space). Accordingly, I find that a jury could not determine that Sergeants Adams and Horton's belief in the lawfulness of their actions was unreasonable, at least insofar as regards plaintiff's right to be free from overcrowding and to be provided a classification system.

■ With respect to plaintiff's right to a safe prison environment, however, the sergeants' qualified immunity defense must fail. Both Sergeant Adams, Adams Dep. 15:21–16:8, and Sergeant Horton, Horton Dep. 167:15–168:6, had the authority to transfer inmates from the dormitory cells to the individual cells at the Burlington County Jail. Both were aware that Scott had been involved in various altercations at the jail during his time there, and both were (or reasonably should have been) aware that the overcrowded conditions at the jail and the understaffed security force made aggression among inmates all the more likely. *See* Adams Dep. 24:9–12, 25:2–6. Despite this knowledge, neither Adams nor Horton attempted to transfer Scott to an individual cell.[15] Because a jury could find that the failure to do so, in light of plaintiff's clearly established right to a safe prison environment, could not reasonably have been considered lawful, summary judgment as to this claim would be inappropriate.[16]

### c. *Corrections Officers*

■ As with the sergeants, plaintiff does not argue that the corrections officers had any authority to rectify the overcrowding problem at Burlington County Jail. *See* Plaintiff's Brief at 23–26. The corrections officers also did not have the authority to institute a formalized classification system at the jail, for that responsi-

14. Plaintiff asserts that no investigation was conducted by the Jail defendants with respect to the Fisher incident (the inmate whose nose was broken by Scott). *See* Plaintiff's Brief at 6. I have not been presented with the portion of Lightsey deposition referenced in plaintiff's brief, and the only other evidence of a lack of investigation is in the deposition of Fisher, who was not in a position to know what independent investigation may have been conducted by jail officials. In any event, no evidence has been proffered indicating that the jail had a policy of not investigating incidents, and there is some evidence that incident reports were prepared as a matter of policy. *See* Adams Dep. 16:12–17, 16:22–17:3. As such, I will not consider the adequacy of the jail's investigative procedures on these motions.

15. Lightsey was told by Sergeants Adams and Horton that Scott would be transferred if he became "uncontrollable." Lightsey Dep. 44:8–12. There is no further elucidation as to what more Scott would have to have done in order to have been considered uncontrollable.

16. Plaintiff states that Sergeants Adams and Horton had the authority to assign an officer to rove the second floor, Plaintiff's Brief at 28, but there is no documentary evidence cited to support this assertion. The Manual for the Burlington County Jail states that the sergeants had the authority to "make post assignments," but it is unclear whether this gave the sergeants the authority to assign the corrections officers to any position deemed advisable for security, or whether it only gave them the authority to assign individual officers to pre-determined posts.

bility fell to Bradman and Pierce. Plaintiff argues that the officers failed to provide plaintiff with a safe prison environment by failing to recommend the transfer of Scott to an individual cell, *id.* at 23–25, and by failing to have at least one officer roam the second floor during mealtimes, rather than having all three serve meals together. *Id.* at 25–26. A jury could not properly find that the corrections officers acted unreasonably in failing to recommend Scott's transfer, when the officers, who were without the authority to effect that transfer, relayed to the sergeants (who could transfer Scott) their belief that Scott was dangerous. *See, e.g.,* Lightsey Dep. 43:16–19. Having placed that information in the sergeants' hands, the officers could not reasonably have expected that to fail to go further and recommend Scott's transfer would subject them to personal liability. Similarly, because plaintiff has not even established that the sergeants, much less the corrections officers, had the authority to order an officer to roam the second floor, the corrections officers were under no duty to alter the regimen prescribed for them by their superiors and take it upon themselves to monitor that floor. As such, the corrections officers are entitled to judgment in their favor on the ground of qualified immunity.[17]

## B. *Section 1983 Liability—Davidson and Daniels*

■ As an initial matter, defendants apparently do not dispute that plaintiff possessed, in October 1983, a protected liberty interest, under the Fourteenth Amendment, in being protected from an assault by a fellow prisoner. In any event, it is clear that such an interest exists. The Supreme Court has observed that prison administrators "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves," *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984), and the Third Circuit has similarly found that

"[b]ecause an inmate is not free to leave the confines which s/he is forced to share with the other prisoners, the state bears the responsibility for the inmate's safety." *Davidson,* 752 F.2d at 821. Accordingly, the Third Circuit has held that inmates enjoy a liberty interest in freedom from attack by fellow prisoners. *Id.* at 822. It is this interest which plaintiff is attempting to vindicate in this § 1983 action.

Defendants assert, *en masse,* that their actions here constitute, at worst, mere negligence, and that as such those actions cannot form the basis of a valid § 1983 claim. *See* Jail Defendants' Brief at 14–20; Reply Letter Brief at 2–3; Board Defendants' Brief at 14–19. In so contending, they rely upon the holdings of *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), that negligent conduct by a state official cannot result in a deprivation under the Due Process Clause of the Fourteenth Amendment. Because their conduct was no more culpable than the conduct described as negligent in *Davidson,* defendants argue, their conduct here cannot be actionable under § 1983. For the following reasons, I reject that argument.

The logical starting point for consideration of defendants' argument is the Supreme Court's opinion in *Davidson.* The facts of that case were as follows:

On December 19, 1980, petitioner was threatened by one McMillan, a fellow inmate ... Petitioner sent a note reporting the incident that found its way to respondent Cannon, the Assistant Superintendent of the prison, who read the note and sent it on to respondent James, a Corrections Sergeant. Cannon subsequently testified that he did not view the situation as urgent because on previous occasions when petitioner had a serious problem he had contacted Cannon directly.

James received the note at about 2 p.m. on December 19, and was informed

---

17. Plaintiff nowhere in these extensive submissions mentions, as the Third Circuit had mentioned, that plaintiff was handcuffed and shackled in the prison infirmary before being taken to the hospital. 860 F.2d at 1201. I assume, therefore, that plaintiff is not pressing any liability against the corrections officers based on these actions.

of its contents. James then attended to other matters, ... and left the note on his desk unread. By the time he left the prison that evening James had forgotten about the note ... Petitioner took no steps other than writing the note to alert the authorities that he feared an attack.... On Sunday, December 21, McMillan attacked petitioner....

474 U.S. at 345–46, 106 S.Ct. at 669. The Supreme Court found that the type of governmental conduct at issue—"respondent Cannon mistakenly believed that the situation was not particularly serious, and respondent James simply forgot about the note"—was not the intentional conduct intended to be governed by the Due Process Clause. *Id.* at 348, 106 S.Ct. at 670. As it noted in the companion case of *Daniels,* the strictures of the Due Process Clause "ha[ve] been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." 474 U.S. at 331, 106 S.Ct. at 665 (emphasis in original). Those deliberate decisions are not present where government officials act negligently, and § 1983 consequently affords no remedy for injuries caused by negligent acts. *Davidson,* 474 U.S. at 348, 106 S.Ct. at 671.

The Third Circuit has held, however, that § 1983 liability may derive from the assault of one inmate by another. Such liability would attach if the assault were shown to have resulted from "intentional conduct, gross negligence or reckless indifference [on the part of state actors], or an established state procedure." *Davidson,* 752 F.2d at 828. As it subsequently noted, the Third Circuit "ha[s] not yet had occasion to define 'gross negligence' or distinguish it from 'reckless disregard' or 'reckless indifference' in the civil rights context." *Colburn v. Upper Darby Township,* 838 F.2d 663, 670 (3d Cir.1988). Shortly thereafter, however, the court provided an example of reckless disregard for a prisoner's safety in *Frett v. Government of the Virgin Islands,* 839 F.2d 968 (3d Cir.1988).

In *Frett,* the evidence at trial disclosed that inmate Soto had exhibited a history of violent behavior in his two years in prison, and that prison authorities were aware of this history. On the day in question, Soto struck a fellow inmate, David, over the head with a rock, in the presence of officer Smith. 839 F.2d at 972. Smith told David to report for medical treatment, and told Soto to report to his dorm to be placed in lockdown. Soto responded "It's not done yet," and ran off; Smith, even though accompanied by three fellow officers, did not attempt to apprehend Soto. *Id.* at 973. Ten minutes later, Soto attacked David with a knife, stabbing him five times. *Id.* at 972. David subsequently brought suit against the Government of the Virgin Islands, alleging *inter alia,* a violation of his due process rights under § 1983.

In response to the government's contention on appeal that its motion for entry of judgment notwithstanding the verdict had been wrongly denied by the trial court, the Third Circuit examined whether Smith (on whose liability the government's liability rested) could have been found to have acted in reckless disregard of David's rights. In affirming the denial of the j.n.o.v. motion, the Third Circuit observed that officer Smith had witnessed the initial attack by Soto, had heard Soto's threat, and had three officers available to assist in subduing Soto. Instead of apprehending Soto, officer Smith chose not to pursue him, perhaps out of fear for his own safety. *Id.* at 978. The *Frett* court continued:

> Smith's testimony evidences a knowledgeable choice of a course of action in the face of a known risk, not forgetfulness or inadvertence. That risk was of such a nature and degree that to disregard it was a gross deviation from the standard of care a corrections officer should have exercised in the situation.

*Id.* The jury, therefore, had sufficient evidence from which to conclude that by failing to apprehend Soto, Smith had acted in reckless disregard of David's rights.

The Supreme Court has also provided an example of what constitutes reckless disregard by a prison official for an inmate's safety. In *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983), a reformatory inmate, Wade, voluntarily entered the institution's protective custody unit because of prior assaults against him by fel-

low inmates. He was shortly thereafter transferred to administrative segregation and was placed by Smith in a cell with an inmate who had been placed in administrative segregation for fighting. *Id.* at 32, 103 S.Ct. at 1627. Smith, who had been on duty a few weeks earlier when an inmate had been killed in the cell, made no effort to determine if any empty cells were available. *Id.* Wade was assaulted by his cellmate and, at the subsequent § 1983 trial, Smith was held to have acted in reckless disregard of Wade's rights. *Id.* at 33, 103 S.Ct. at 1628. The Supreme Court affirmed the imposition of punitive damages on the basis of Smith's reckless conduct. *Id.* at 51, 103 S.Ct. at 1637; *see id.* at 55, 103 S.Ct. at 1639 (Smith's qualified immunity inapplicable where his actions amounted to "reckless or callous indifference to the rights and safety of the prisoners in his charge"); *Davidson*, 474 U.S. at 356, 106 S.Ct. at 675 (Blackmun, J., dissenting) ("The Court has previously indicated that prison officials act recklessly when they disregard the potential for violence between a known violent inmate and a known likely victim," citing *Smith v. Wade* ).[18]

As noted *supra*, defendants argue that their actions were no more egregious than the prison officials' actions in *Davidson*, and, thus, that they may not be held liable under § 1983. It is clear to me, however, that these defendants—the Board, Warden Bradman, Captain Pierce, and Sergeants Adams and Horton—engaged in action that was considerably more culpable than that of the *Davidson* defendants. In *Davidson*, the officials received one note, with no indication of the seriousness of the threat and no personal follow-up by the prisoner (as was his usual practice in serious cases). One official underestimated the threat's seriousness while the other forgot about the note. 474 U.S. at 348, 106 S.Ct. at 670. Here, Bradman, Pierce, Adams, and Horton

were all aware of Scott's violent propensities, as those propensities had culminated in violence on a number of occasions during Scott's time at the Burlington County Jail, and they were aware of the tendency of fights to erupt during mealtimes. All the defendants were aware of the extreme overcrowding at the jail, all were aware of the inadequate security staff, and all were aware of the lack of any classification system, all of which conditions had been characteristic of the jail for a number of years prior to October 1983. Nothing was done about these conditions, and nothing was done about the presence of Scott in an overcrowded cell overseen by insufficient security staff. Although I cannot (and need not) decide whether these circumstances amount to a reckless disregard of plaintiff's rights as envisioned by *Frett* and *Smith*, *supra*, these circumstances are clearly at least one step beyond the mere negligence evidenced in *Davidson*. Defendants' *Davidson* argument must be rejected.

Moreover, the Third Circuit has on a number of occasions noted that a prison official's deliberate failure to act may result in § 1983 liability. In "provid[ing] examples of conduct beyond mere negligence" in *Davidson*, the court observed that "when officials with a responsibility to prevent harm, such as prison officials, fail to establish or execute appropriate procedures for preventing serious malfunctions in the administration of justice, such a failure would support a claim under § 1983." 752 F.2d at 828. In *Colburn*, a § 1983 claim was stated when it was alleged that the county prison's "custom of inadequate monitoring of jail cells," in conjunction with circumstances from which defendant prison officials knew or should have known of an inmate's suicidal tendencies, resulted in the inmate's suicide.[19] 838 F.2d at 670–

---

18. *See also* Restatement (Second) of Torts, § 500 (emphasis added):

The actor's conduct is in reckless disregard of the safety of another if he does an act *or intentionally fails to do an act which it is his duty to the other to do,* knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his

conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

19. The Third Circuit interpreted *Colburn* in *Freedman v. City of Allentown, Pa.,* 853 F.2d 1111 (3d Cir.1988), as holding that "when the

72. Finally, in *Black v. Stephens*, 662 F.2d 181 (3d Cir.1981), the court held that the chief of police's inaction could support an inference that he maintained a policy of encouraging excessive force, given the chief's delay in investigating officers charged with excessive violence and his refusal to file disciplinary complaints in officers' personnel records. *Id.* at 189–91;[20] *see Partridge v. Two Unknown Police Officers*, 791 F.2d 1182, 1188–89 (5th Cir.1986) (inadequate monitoring of suicidal detainees actionable under § 1983), *cited in Colburn*, 838 F.2d at 672.

The evidence in the record before me would clearly enable a jury to find that the remaining defendants' failure to act, in light of their knowledge of the conditions at the Burlington County Jail and (excluding the Board) their knowledge of Scott's dangerousness, was sufficiently deliberate to implicate the Due Process Clause and support a § 1983 claim. The Board made deliberate decisions not to pay for immediate renovation of the jail, but instead to build a new facility at a later date; not to accept state aid, in the form of the county assistance plan or the pre-fabricated prison units; not to accede to Warden Bradman's repeated requests for additional security staff; and not to insist on a classification system at the jail, knowing that such a system was mandated by *Vespa*. Warden Bradman made a deliberate decision not to accept state aid, and he and Captain Pierce made deliberate decisions not to put in place any classification system; not to transfer Scott, whom they knew to be dan-gerous, to an individual cell or to a state institution; and not to assign a corrections officer to monitor the second floor. Sergeants Adams and Horton made a deliberate decision not to transfer Scott, about whose violent tendencies they had been warned by the corrections officers, to an individual cell. These defendants could be found to have deliberately failed to act in the presence of conditions that they knew or should have known posed a great risk of injury to inmates at the Burlington County Jail. In the event a jury made such a finding, a § 1983 claim would properly lie against these defendants.

## C. *Legislative Immunity*

The Board defendants contend that their decision to operate the existing Burlington County Jail while building a new one and their decision to not pay for additional security officers were legislative acts and, thus, that they are entitled to absolute immunity for any liability arising from those decisions. Because plaintiff would not have been injured had the Board decided to renovate rather than build or decided to hire additional staff, the argument continues, the Board members must be granted absolute legislative immunity. Board Defendants' Brief at 34–38; Reply Letter Brief at 6–9. For the following reasons, I reject that argument.

The Third Circuit has acknowledged that the doctrine of absolute legislative immunity, as first articulated in *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct.

factual scenario presented by plaintiff suggests that defendants should have known that the prisoner was a suicide risk, and failed to take necessary and available precautions to protect the prisoner from self-inflicted wounds," a valid § 1983 claim was stated. 853 F.2d at 1115. The *Freedman* court held that the facts of that case—prison officials' failure to recognize "suicide hesitation cuts" on an inmate's wrists—did not meet the *Colburn* standard. *Id.* at 1115–16. As my discussion *infra* demonstrates, that standard is met here: the evidence would permit a finding that defendants knew or should have known of Scott's violent tendencies, and of the dangers posed by overcrowding, by lack of classification, and by lack of adequate security, and yet took no action in light of that knowledge.

**20.** These cases are to be distinguished from *Chinchello v. Fenton*, 805 F.2d 126, 134 (3d Cir. 1986), wherein the Third Circuit held that a prison supervisor's failure to train his subordinates did not subject the supervisor to liability based upon constitutional deprivations committed by the subordinates, absent a pattern of such deprivations. *See Colburn*, 838 F.2d at 672. Here, Bradman and Pierce are not being held accountable for their subordinates' actions; rather, plaintiff seeks to call them to account for their own alleged deliberate decision to not rectify the situation at Burlington County Jail. Accordingly, Bradman and Pierce's contention that *Chinchello* affords them relief, *see* Jail Defendants' Reply Letter Brief at 4, must be rejected.

783, 95 L.Ed. 1019 (1951), applies to the legislative acts of municipal governing bodies. *Aitchison v. Raffiani*, 708 F.2d 96, 98–100 (3d Cir.1983). In order for legislative immunity to attach, the defendant seeking immunity must demonstrate both that the challenged functions performed by that defendant were legislative, rather than managerial, in nature, and that the functions were carried out pursuant to the prescribed statutory procedures governing legislative enactments. *Abraham v. Pekarski*, 728 F.2d 167, 174 (3d Cir.1984). In other words, the action of a defendant must be both substantively and procedurally legislative.

■■■ As an initial matter, I harbor strong doubts that the decisions by the Board to build a new jail and to refuse to hire additional jail staff could be considered legislative in nature. The Third Circuit, in *Rogin v. Bensalem Township*, 616 F.2d 680, 693 (3d Cir.1980), observed that legislative acts apply generally to the community whereas administrative acts apply to one or a few individuals. *See* Reply Letter Brief at 7. The decisions as to the Burlington County Jail directly affected only those relatively few inmates residing there, rather than affecting the whole of Burlington County. Moreover, the Board's argument that its decisions not to spend involved the budget-making process, a quintessentially legislative function, *see id.* at 8–9, proves too much. Under that theory, the Board could have chosen, on the basis of the cost involved, simply not to spend any money on altering the old jail *or* building a new one, and would be immunized from any liability because the decision to do nothing was part of the budget process. If the Board's argument requires that result, that argument must be rejected.

In any event, the Board's decision not to expend the money required to renovate or staff the Burlington County Jail was not reached in a legislative manner. In *Abraham*, the Third Circuit held that the municipal board's decision to discharge a township director was not a legislative act, because in making the decision the board did not follow the procedural rules prescribed by Pennsylvania statute for legislative enactments by municipal boards. 728 F.2d at 174–75; *see Donivan v. Dallastown Borough*, 835 F.2d 486, 489 (3d Cir.1987) (where statute requires legislative act to be passed by ordinance, decision reached by vote was *per se* not legislative). The relevant New Jersey statute states that "[t]he legislative power of the county shall be vested in the board of chosen freeholders," and, with the exception of particular powers not at issue here, "[s]uch legislative power shall be exercised by ordinance." N.J.S.A. 40:41A–38.

The Board points to no ordinance regarding the renovation or operation of the Burlington County Jail, nor even a resolution regarding those issues. The only relevant document before me is an amended settlement agreement in the *Vespa* litigation, dated June 20, 1984 (some eight months after plaintiff's injury), providing that the parties agree that the Board may replace the Burlington County Jail instead of renovating it. Knox Aff., Exh. N. There is no resolution or ordinance referenced therein; it is merely stated that the Board "has determined that it is in the best interest of Burlington County to construct a new jail facility." *Id.* On this showing, no legislative act has been demonstrated by the Board defendants, and no legislative immunity attaches to the Board's actions herein. The Board's motion is therefore denied.

For the foregoing reasons, the motions for summary judgment brought by the Board defendants and by the Jail defendants are denied, except that the summary judgment motion of the corrections officers is granted on the ground of qualified immunity. An appropriate order will issue.