889 F.2d 1286
 Timothy RYAN
v.
BURLINGTON COUNTY, NEW JERSEY, et al., Defendants.
and
BURLINGTON COUNTY, Harold Colburn, Jr., Michael J. Conda,
Catherine A. Costa, Henry J. Metzger, Robert C. Shinn,
Michael J. Hogan, and Burlington County Solicitor's Office,
Defendants/Third Party Plaintiffs,
v.
Maurice SCOTT, Third Party Defendant.
and
John BRADMAN, Individually and Officially as Warden of
Burlington County Jail, et al., Defendants/Third
Party Plaintiffs,
v.
Maurice SCOTT, Third Party Defendants.
Appeal of Harold COLBURN, Jr., Michael Conda, Catherine H.
Costa, Henry J. Metzger and Robert C. Shinn, Jr.
 No. 89-5286.
 United States Court of Appeals,
Third Circuit.
 Submitted Under Third Circuit Rule 12(6)
Nov. 8, 1989.
 Decided Nov. 21, 1989.
 
 Robert M. Tosti, John F. McDonnell, Rand, Algeier, Tosti, Woodruff & Frieze, P.C., Morristown, N.J., for appellant.
 Joseph Goldberg, Kurt Denke, Slimm, Dash and Goldberg, Westmont, N.J., Albert Dragon, A. Dragon Associates, Philadelphia, Pa., for appellee.
 Before MANSMANN and GREENBERG, Circuit Judges, and GAWTHROP, District Judge.*OPINION OF THE COURT
 MANSMANN, Circuit Judge.
 
 
 1
 The overcrowded conditions in the Burlington County Jail which led to the injury of Timothy Ryan, an individual arrested for traffic violations, form the factual basis of this appeal wherein we must decide if the individual members of the Board of Chosen Freeholders are entitled to qualified or absolute immunity from liability for Ryan's injuries. Because we find that the Board members were not acting in their legislative capacity when administering the County Jail, we conclude that they are not entitled to absolute immunity. Moreover, since the rights alleged to be violated here were firmly entrenched in our legal system at the time of Ryan's injury, and because Ryan raised a question of fact as to whether the actions of the Board members violated those rights, we will affirm the order of the district court denying summary judgment to the Board members.
 
 I.
 
 2
 This is the second appeal arising from the Sec. 1983 action brought against the defendant Freeholders by Timothy Ryan, who was injured by an inmate in the overcrowded Burlington County Jail rendering Ryan quadriplegic. The defendants include: Harold Colburn, Jr., Michael J. Conda, Catherine A. Costa, Henry J. Metzger, and, Robert C. Shinn, Jr., both individually and in their capacity as the Burlington County Board of Chosen Freeholders; John Bradman, individually and as Warden of the Burlington County Jail; Michael J. Hogan, individually and as Solicitor of Burlington County; William H. Fauver individually and as Commissioner of the New Jersey Department of Corrections; John Call, individually and as Deputy Director of the Division of Adult Institutions in New Jersey; as well as ten corrections officers at the County Jail. Our previous decision in Ryan v. Burlington County, N.J., 860 F.2d 1199 (3d Cir.1988) (Ryan II ) affirmed the district court's denial of summary judgment for Fauver and Call on the grounds of qualified immunity. 860 F.2d at 1209.
 
 
 3
 The Burlington County Jail is located in Mount Holly, New Jersey. The two story building had formerly been used as an armory. The first floor of the Jail contains dormitory housing; the second floor contains four individual maximum security cell blocks and six dormitory cells. In April, 1977, and March, 1978, the inmates of the Jail brought lawsuits against the authorities (referred to hereafter as the Vespa lawsuits), alleging that the conditions of the Jail violated the United States Constitution and the laws of New Jersey. Essentially, the Vespa suits claimed the Jail was overcrowded and had no effective classification system. Ryan II, 860 F.2d at 1201.
 
 
 4
 The Board accepted the advice of a corrections expert, as well as of the county solicitor, and attempted to settle the case. On May 13, 1981, the Board adopted a resolution assuming jurisdiction of the Jail from the Sheriff's office, in part to effectuate the settlement agreement. The Vespa settlement agreement was approved on June 1, 1981 by the district court. Ryan II, 860 F.2d at 1201, n. 2.
 
 
 5
 The Vespa agreement did not contain an admission on the Board's part that the inmates' constitutional rights had been violated, however, it did require that no more than 117 inmates were to be housed in the Jail at any given day and a maximum of eight inmates were to be placed in cell 208. The Vespa agreement also provided that renovations to the Jail were to be completed by June 22, 1983. Provisions were made to alter the Jail's physical plant and administration, such as adequate lighting, heating, and plumbing, and a law library. Ryan v. Burlington County, N.J., 708 F.Supp. 623, 626 (D.N.J.1989) (Ryan III ).
 
 
 6
 The day after the entry of the agreement, the New Jersey Governor signed an executive order (E.O. No. 106) designed to relieve the problem of overcrowding in the state and county prisons. E.O. No. 106 directed that William Fauver, Commissioner of the Department of Public Corrections, was to be given the authority to designate the place of confinement of all state and county inmates. The executive order had an adverse effect on the overcrowding problem at the Burlington County Jail. Between July 1981 and February 1982, as the influx of state prisoners varied, the average daily population at the Jail was 157 inmates, while over the following year the average was 147 inmates. Between September 15 and October 7, 1983, the Jail inmate population ranged from 128 to 165. Accordingly, the Vespa inmate cap of 117 was always exceeded. Ryan III, 708 F.Supp. 626-27.
 
 
 7
 On September 30, 1983, Timothy Ryan was arrested in Medford Township and charged with motor vehicle violations. Because he could not post bail, Ryan was sent to the Burlington County Jail where he was placed in cell 208 with nine other inmates. One of the inmates also assigned to cell 208 was Maurice Scott, an inmate awaiting transfer to a state facility for violation of state parole. During the two month period of Scott's incarceration, he had been involved in several violent attacks. Jail documents show that Scott had been convicted of a violent crime resulting in the injury or death of another person. Ryan II, 860 F.2d at 1201.
 
 
 8
 On October 4, 1983, Scott attacked Ryan over some food that had been brought to the cell for breakfast. At some time after the attack, the prison guards were called and they brought a stretcher. Ryan was placed on the stretcher and carried to the Jail's infirmary where he was handcuffed and shackled before being taken to the hospital by ambulance. Hospital personnel diagnosed that Ryan's neck had been broken rendering him quadriplegic. Ryan II, 860 F.2d at 1201-02.
 
 
 9
 In April, 1985, Ryan brought suit against the named defendants seeking compensatory and punitive damages under 42 U.S.C.A. Secs. 1983, 1985, and under pendent state law causes of action. In 1987, the district court dismissed Ryan's Sec. 1985 claims and granted Hogan's motion for summary judgment on the basis of qualified immunity while rejecting Fauver and Hall's motions for identical relief. See, Ryan v. Burlington County, 674 F.Supp. 464 (D.N.J.1987) (Ryan I ). We affirmed at Ryan II, 860 F.2d 1199.
 
 
 10
 The case before us now involves an appeal by the Board of Freeholders from the district court's denial of summary judgment in their favor on the basis of absolute and qualified immunity. The Jail defendants, which included the corrections officers, the warden, the captain and two sergeants, also moved for summary judgment. The district court granted the motion as to the corrections officers on the basis of qualified immunity, but denied the motion as to the remaining Jail defendants. Only the appeal of the Freeholders is before us.
 
 
 11
 We have jurisdiction to hear the appeal from a denial of a motion for summary judgment when it involves a defense of qualified immunity because we recognize that the defense involves an immunity from suit which is lost if the party cannot raise the issue until after trial.[1] Hynson v. City of Chester Legal Dept., 864 F.2d 1026 (3d Cir.1988). Thus, we follow the collateral order doctrine of Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) and Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).
 
 
 12
 It is settled law that we have plenary review of the grant or denial of a summary judgment motion and we apply the same test that the district court would apply initially under Rule 56. Hynson, 864 F.2d at 1029. "The requirement is that there be no genuine issue of material fact. That is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party summary judgment must be denied." Id. (Emphasis and citations omitted.)II.
 
 
 13
 The Freeholders raise two defenses against Ryan's suit: absolute immunity and qualified immunity. The Freeholders contend that they should be absolutely immune from suit because they are the legislative body of the county and where local officials act in a legislative capacity, they are entitled to absolute immunity. The Freeholders reason that since Ryan's complaint alleges that the Freeholders failed to authorize sufficient funds to remedy the Jail overcrowding or classify the inmates, this is the type of legislative activity which renders them absolutely immune. In addition, the Freeholders submit that they are also entitled to qualified immunity because as public officials, their actions were discretionary and therefore shielded so long as they could reasonably have thought their acts conformed to the rights they are alleged to have violated. See Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). We will discuss the Freeholders' contentions seriatim.[2]
 
 A.
 
 14
 In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), the Supreme Court held that members of state legislatures have absolute immunity from suits for damages under Sec. 1983 and Sec. 1985(3). By so holding, the Court recognized and reiterated a right that was taken for granted by the Founders of the Nation. As James Wilson, a Pennsylvania delegate to the Constitutional Convention, explained:
 
 
 15
 In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offence.
 
 
 16
 Tenney, 341 U.S. at 373, 71 S.Ct. at 786, citing, II Works of James Wilson, 38 (Andrews ed. 1896). Thus, the Tenney Court recognized that the Civil War statutes, then codified at 8 U.S.C. Secs. 43, 47(3), now found at 42 U.S.C.A. Secs. 1983, 1985(3), were not intended to overturn the traditional legislative freedom. 341 U.S. at 376, 71 S.Ct. at 788.
 
 
 17
 It is generally understood that local governmental bodies such as the Board of Chosen Freeholders are given a combination of proprietary, managerial and legislative powers. It is only with respect to the legislative powers delegated to them by the state legislatures that the members of local governing boards are entitled to absolute immunity. See Aitchison v. Raffiani, 708 F.2d 96 (3d Cir.1983); and Donivan v. Dallastown Borough, 835 F.2d 486 (3d Cir.1987). A fortiori, in order to determine whether the Freeholders enjoy absolute immunity, it is necessary to decide if the function performed by the Freeholders at the time of the alleged violation was legislative, managerial or proprietary. The Freeholders contend that since Ryan's complaint alleges that the Freeholders failed to authorize the renovation of the Jail or the building of a new facility or allocate funds for additional corrections officer positions, these activities involve the budgetary process of the Board and therefore go to the heart of the legislative process.
 
 
 18
 There are two requirements which an act must meet in order to be regarded as legislative for immunity purposes. First, the act must be "substantively" legislative, i.e., legislative in character. Legislative acts are those which involve policy-making decision of a general scope or, to put it another way, legislation involves line-drawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration. In addition, the act must be "procedurally" legislative, that is, passed by means of established legislative procedures. This principle requires that constitutionally accepted procedures of enacting the legislation must be followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve. E.g., Immigration & Naturalization Service v. Chadha, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (holding one-house legislative veto unconstitutional).[3] Thus, the procedure the legislature follows is as equally important as the substantive law enacted.
 
 
 19
 The district court determined that the Freeholders had failed to follow the procedures required by county governments when dealing with the Jail administration and therefore lost the legislative immunity since the actions were not procedurally legislative. The Freeholders counter that N.J.S.A. 40:41A-38, which requires that legislative action can only be accomplished through passage of an ordinance, is not applicable to Burlington County since it has not adopted the Optional County Charter Law of 1972, N.J.S.A. 40:41A-1 et seq.[4] If the Freeholders raise this point to argue that they do not have to follow any legislative procedure, we must disagree.
 
 
 20
 The Freeholders argue that because of the nature of the Board, they act in an informal manner and not every decision results in a resolution. We note that the Freeholders were cognizant of the need to follow procedures in the assumption of jurisdiction of the Jail from the Sheriff's Office when they passed the resolution on May 13, 1981. When the decision of a governing body has impact on the community as a whole, the proper procedures for legislating must be followed or that governing body, here the Board, risks running afoul of constitutionally mandated due process rights. On the other hand, when the Freeholders acquired the jurisdiction of the Jail and took over the Sheriff's authority, they assumed the administrative functions from the Sheriff. To characterize these acts as legislative because they are performed by a governing body that has the power to legislate is to follow an improper syllogism.
 
 
 21
 While the assumption of control over the Jail followed legislative procedures, the implementation of the daily decisions involving the administration of the Jail was not legislative, but managerial. Moreover, the Freeholders' decisions with regard to the inmates and the staff of the Jail did not affect the community as a whole. This is a strong indication that legislative line-drawing was not implicated. Indeed, the Freeholders point to no ordinance or resolution regarding the renovation or operation of the Jail upon which they rely to justify their actions as legislative.[5] Clearly, the Freeholders' actions with regard to the Jail administration were neither procedurally nor substantively legislative. We conclude that the district court properly denied the Freeholders' motion for summary judgment on the grounds of absolute immunity.
 
 B.
 
 22
 We now address the Freeholders' contentions that they are entitled to qualified immunity from Ryan's suit. The defense of qualified immunity is a recognition of the fact that subjecting public officials to personal liability for their discretionary actions results in the distraction of those officials from their public duties, inhibits their discretionary actions and, quite possibly, deters qualified people from accepting public service. Cf. Harlow v. Fitzgerald, 457 U.S. 800, 815, 102 S.Ct. 2727, 2736-37, 73 L.Ed.2d 396 (1982). Thus, the doctrine of qualified immunity balances the interest in allowing public officials to perform their discretionary functions without fear of suit against the public's interest in vindicating important federal rights. Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987), and, Hynson v. City of Chester, 864 F.2d 1026, 1031 (3d Cir.1988). The Supreme Court concluded in Harlow that "[r]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." 457 U.S. at 818, 102 S.Ct. at 2738. The Court further instructed that
 
 
 23
 On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time the action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful ... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.
 
 
 24
 Harlow, 457 U.S. at 818, 102 S.Ct. at 2738.
 
 
 25
 The district court examined Ryan's complaint against the Freeholders and found that it was premised on three separate rights: 1) as a pretrial detainee, Ryan had the right "to be free from overcrowded conditions that amounted to an imposition of punishment;" 2) "a constitutional right to be housed separately from known dangerous convicted inmates who pose a threat to their personal security;" and, 3) "the right to be housed in a reasonably safe prison environment." Ryan III, 708 F.Supp. at 626.
 
 
 26
 The right to be free from overcrowded conditions is based upon the Supreme Court decision in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Bell involved a class action brought by the inmates of the Metropolitan Correctional Center, a short-term custodial center located in New York City. The inmates alleged, inter alia, that the procedure of placing two people in cells originally designed for single occupancy (double-bunking) was a violation of constitutional rights. The Court analyzed the legal support for the inmates' argument and concluded that only if the practice amounted to a punishment could it be considered a violation of rights. The Court reasoned that since a pre-trial detainee is still presumed innocent until his conviction--if convicted--the conditions or restrictions of his detention must be reasonably related to a legitimate governmental purpose, e.g., to assure the detainee's presence at trial. Bell, 441 U.S. at 538-39, 99 S.Ct. at 1873-74.[6] Thus, the Court concluded, although double-bunking was uncomfortable and restrictive, it could not be said to be punishment.
 
 
 27
 The district court found in Ryan I, 674 F.Supp. at 476-77 that the evidence of the overcrowded conditions at the Jail would support a finding that Ryan had been unconstitutionally subjected to punishment. Indeed, the Freeholders do not here contest that the law in October, 1983 was clearly established that pretrial detainees possessed the right to be free from overcrowded conditions. Instead, the Freeholders dispute they should have known that their actions or omissions violated that right.
 
 
 28
 The Freeholders contend that several factors have made it impossible for them to comply with the Vespa agreement. For example, because of E.O. No. 106, state inmates were being housed until transfer to state facilities. Thus, the Freeholders argue, the county inmate population would have been close to the 117 inmate cap but for the state inmate population. As such, the Freeholders could not have known that their actions violated federally protected rights. We are not impressed with this argument which seems to imply that close to, which ranged any where from meeting the cap to being thirteen over, is good enough. The Freeholders' potential liability does not merely lie with the fact that the inmate population exceeded the cap, but rather, that the overcrowded conditions and lack of supervision were known to the Freeholders and were permitted to continue despite the assurances given in the Vespa agreement that conditions would be improved.
 
 
 29
 Ryan's second recognized right, the right to be classified and housed separately from known dangerous convicted inmates was found to exist by the district court in Ryan I, 674 F.Supp. at 477-78, and affirmed by us in Ryan II, 860 F.2d 1204. The Freeholders do not challenge the fact that Ryan's right to a classification system was clearly established in October, 1983, but rather, claim they were told that such a system was impossible to implement. Although several state inspection reports issued by the Department of Corrections indicated that an "effective classification system" was not possible, the reports nonetheless recommended that a classification plan and manual be completed, thereby indicating that some type of classification system was possible. In addition, several expert witnesses involved in the Vespa lawsuit settlement informed the Freeholders that a classification system was necessary. Clearly, these conflicting points raise a question of fact as to whether a reasonable Jail administrator[7] would have known that an inmate classification system could have been implemented in October, 1983.
 
 
 30
 We are equally unpersuaded by the Freeholders' argument that the warden was to implement the classification system. As with any hierarchy of command, whether civilian or military, if the top brass shows no interest in assuring that a certain job is complete, the next in line has no interest, either. Regardless of whether it was the Freeholders or the warden who was to implement the classification system, the Freeholders did nothing to remedy the violation of the Vespa decree by correcting the situation. As we stated in Stoneking v. Bradford Area School District, 882 F.2d 720 (3rd Cir.1989) "state officials may [not] escape liability arising from their policies maintained in deliberate indifference to actions taken by their subordinates". 882 F.2d at 725. In addition, we noted that a municipality may be liable under Sec. 1983 "where its policymakers made a 'deliberate choice to follow a course of action from among various alternatives'." Id. (Citations omitted.) Here, the deliberate choice made by the Freeholders could be considered that of doing nothing.
 
 
 31
 The district court found that Ryan possessed a third right of being housed in a "reasonably safe prison environment." Ryan III, 708 F.Supp. at 626. The court based this right on our decision in Stoneking v. Bradford Area School District, 856 F.2d 594, n. 14 (3d Cir.1988) (recognizing that by 1979 state officials had duty to protect institutionalized persons from self-injury or assault), vacated sub. nom. Smith v. Stoneking, --- U.S. ----, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), op. on remand, 882 F.2d 721 (3d Cir.1989), and on the Supreme Court decision in Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (same).
 
 
 32
 The warden testified that between 1981 and 1985 he repeatedly requested additional security personnel from the Freeholders. In particular, the warden stated that his request for increased personnel on the midnight to 8:00 a.m. shift was not granted until 1984, indicating that at the time of Ryan's injury the warden considered the shift to be understaffed. A rational juror could conclude from this evidence that the Freeholders could not have reasonably believed that their refusal to supply the Jail with additional security personnel was lawful in view of the inmates' right to a secure environment. Since questions of fact exist, the case is not appropriate for summary judgment.
 
 IV.
 
 33
 The most disturbing aspect of this tragic case is that the Freeholders sat idly by in the face of a two year violation of a consent decree and apparently did absolutely nothing. Some of the Freeholders have expressed ignorance of their responsibilities toward the Jail and the inmates, while others clearly understood that the Jail was overcrowded but felt there was nothing that could be done because of the influx of state prisoners. Although legislative immunity does protect a public official acting in a legislative capacity from liability for damages, when the legislative power is set aside to take on administrative duties, here running the county jail, then those officials must be held accountable for instances where their actions violate clearly established rights. The law of this circuit is clear as to what the Freeholders, in their capacity as jail administrators, should have done. It remains a question for the jury to determine whether what they did--in this case apparently nothing--violated the clearly established rights of the plaintiff, Timothy Ryan. For the above stated reasons, we will affirm the order of the district court denying summary judgment to the Board defendants on the grounds of both qualified and absolute legislative immunity.
 
 
 
 *
 Honorable Robert S. Gawthrop, III of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Because the Burlington County Board of Chosen Freeholders is a government entity and not a natural person, under Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) it is not entitled to qualified immunity. Therefore, we do not have jurisdiction under the collateral order doctrine to hear an appeal from the denial of summary judgment as to the Burlington County Board of Chosen Freeholders. By order dated May 18, 1989, upon motion by Ryan, the appeal was dismissed as to the Burlington County Board of Chosen Freeholders
 
 
 [2]
 Ryan also argues that, because our jurisdiction is premised on the purely legal question of whether the facts support a claim of violation of clearly established law, he would have filed a motion to dismiss the appeal because the Freeholders' only raise issues relating to their personal involvement, which are facts. We previously resolved this issue in Ryan v. Burlington County, N.J., 860 F.2d 1199 (3d Cir.1988) where we noted that the "issues involved in considering the merits of qualified immunity claims are frequently difficult to separate from the issues involved in the merits of the liability question". 860 F.2d at 1203, n. 7. In other words, "the necessity of reviewing the record to determine the propriety of a district court's denial of a qualified immunity claim does not divest an appellate court of its jurisdiction." 860 F.2d at 1202-03. In view of our holding, we need not further discuss Ryan's argument
 
 
 [3]
 Federal law is cited here because there can be no doubt that if the Board had enacted an ordinance or resolution implicating federally protected constitutional rights, the Board would be a state actor subject to the procedural mandates of the fourteenth amendment. We need not here decide whether the New Jersey Constitution is likewise implicated
 
 
 [4]
 The Board necessarily falls under N.J.S.A. 40:20-1 which provides:
 Management vested in board of freeholders; delegation of powers and duties to county administrator
 The property, finances and affairs of every county shall be managed, controlled and governed by a board elected therein, to be known as "the board of chosen freeholders of the county of....[ ] and the executive and legislative powers of the county shall be vested in that board of chosen freeholders, except where by law specific powers or duties are imposed or vested in a Constitutional officer.
 N.J.S.A. 40:20-1 (West 1967 & 1989 Supp.). Thus, the Board has been delegated legislative powers by the State legislature.
 
 
 [5]
 The Board conceded at oral argument before the district court that there were no ordinances or resolutions. See Brief of Appellee Timothy Ryan at 49
 
 
 [6]
 The Court gave the following example as detention intended to punish:
 loading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternate and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.
 441 U.S. at 539 n. 20, 99 S.Ct. at 1874 n. 20.
 
 
 [7]
 We state the question in terms of "reasonable Jail administrator" because this would be the position in which the Freeholders stood, i.e. substituting for the Sheriff since they had assumed jurisdiction of the Jail in 1981