

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-12-1996

# Carver v. Foerster

Precedential or Non-Precedential:

Docket 96-3008

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Carver v. Foerster" (1996). *1996 Decisions.* Paper 14.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/14

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 96-3008


PHYLLIS CARVER; THOMAS FOX; APRIL MOORE; ROBERTA RUDOLPH

v.

TOM FOERSTER, an individual and Chairman, Allegheny
County Commissioners; COUNTY OF ALLEGHENY

Appellants.


On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 93-cv-00912)


Argued September 17, 1996

Before: BECKER, NYGAARD and ROTH, Circuit Judges

(Opinion Filed December 12, 1996)

Paul D. Boas, Esq. (Argued)
Mark D. Lancaster, Esq.
Berlin, Boas & Isaacson
429 Fourth Avenue
1906 Law & Finance Building
Pittsburgh, PA 15219

        Attorneys for Appellees


Mark R. Hornak, Esq. (Argued)
Gregory A. Miller, Esq.
Buchanan Ingersoll Professional Corporation
One Oxford Centre
301 Grant Street
20th Floor

Pittsburgh, PA 15219-1410

Attorneys for Appellants

OPINION OF THE COURT

Roth, Circuit Judge:

Plaintiffs brought suit under 42 U.S.C. § 1983 against Allegheny County and Tom Foerster, Chairman of the Board of Commissioners of Allegheny County and a member of the Allegheny County Salary Board, charging that Foerster had eliminated their jobs with Allegheny County because they supported Joe Brimmeier in the Democratic primary for Prothonotary. Allegheny County and Foerster moved for summary judgment based on absolute legislative immunity because plaintiffs' positions had been eliminated by a vote of the Salary Board. Foerster also claimed qualified immunity for his actions as a member of the Salary Board. The district court denied the motions on the ground that Foerster was not entitled to absolute or qualified immunity for his pre-vote activities and that municipalities do not enjoy legislative immunity from Section 1983 suits. Both defendants appeal the denial of absolute legislative immunity. We agree with the district court's reasoning and will affirm.

I. Facts

Tom Foerster was Chairman of the County Board of Commissioners and a member of the Salary Board throughout the time the events in question took place. The Allegheny Salary Board is composed of four members: three County Commissioners and the County Controller. The Board sets the maximum and minimum salary range for County jobs. It is also the only entity within the County with the power to create or eliminate positions.

In May 1991, Joe Brimmeier, a former aide to Foerster, ran in the Democratic primary for the position of Prothonotary of Allegheny County. Foerster vocally opposed Brimmeier's candidacy. The four plaintiffs actively supported Brimmeier in the primary election. Brimmeier lost.

Foerster was re-elected Commissioner in November, 1991. Following the election, James Dodaro, the County Solicitor, notified Foerster of his plan to resign at the end of the year. Foerster appointed Ira Weiss to replace Dodaro as of January 6, 1992. On January 3, three days before his appointment was effective, Weiss fired plaintiffs, Roberta Rudolph and April Moore, and told them that their positions as administrative assistant and Risk Manager were being eliminated. When Dodaro intervened to ask Weiss to keep Rudolph and Moore, Weiss reportedly replied, "No, they want them out now." Rudolph and Moore were offered alternate positions as typists at approximately half their salaries. They

rejected these positions.  On January 8, 1992, five days after notifying Rudolph and Moore that their jobs were eliminated, Weiss signed a request asking the Salary Board to eliminate nine positions, including those held by Rudolph and Moore.  On January 16, 1992, the Salary Board unanimously approved the request.

Plaintiffs Phyllis Carver and Thomas Fox held positions in the Department of Development.  Carver was a planning and evaluation specialist, and Fox was manager of marketing.  Shortly after Brimmeier's candidacy for Prothonotary failed, Foerster allegedly had Wayne Fusaro, one of his Executive Aides, compile a "hit list" of Brimmeier supporters.  The list reportedly included Carver and Fox.

On June 19, 1992, George Braun, the Director of Development, notified Carver and Fox that he was eliminating their positions because of budgetary concerns. Two other positions within the Department of Development were eliminated at the same time.  Braun submitted his request for Salary Board action on June 12, and the Salary Board unanimously approved his recommendation for termination on June 18.  Neither Fox nor Carver were offered positions elsewhere in county government.

According to the defendants, Braun's elimination of the positions was spurred by a Federal Housing and Urban Development audit, which had found excessive administration expenses by the department.  The defendants assert that the positions were eliminated as part of a larger attempt to keep down administrative costs.  The defendants further contend that at the same two sessions that the plaintiffs lost their positions, the Salary Board took additional actions affecting 19 other county departments, resulting in the elimination of twenty two other positions.  In her Report and Recommendation, however, the magistrate judge noted that about the time Fox and Carver's positions were eliminated, three new positions were created in the Department of Development and other employees received raises.

The plaintiffs assert that the Salary Board would automatically approve any proposal to eliminate jobs without independent consideration and that once Foerster made it known that he wanted plaintiffs' positions eliminated, the vote of the Salary Board was a mere formality.

On June 9, 1993, the plaintiffs filed suit against Allegheny County and against Foerster, individually and in his official capacity as Chairman of the Allegheny County Board of Commissioners.  After extensive discovery, defendants filed for summary judgment.  The magistrate judge denied defendants' motion. The District Court adopted the magistrate judge's report and recommendation.  Defendants have appealed that portion of the District Court's decision relating to absolute legislative immunity, as well as those defenses "inextricably intertwined" with their immunity claims.

## II.  Jurisdiction and Standard of Review

Ordinarily, this court does not have jurisdiction to review a lower court's denial of summary judgment since a denial of summary judgment does not constitute a "final decision" within the meaning of 28 U.S.C. 1291.  See In re City of Philadelphia Litigation, 49 F.3d 945, 956 (3d Cir.), cert. denied, 116 S.Ct. 176

(1995).  When the summary judgment motion is premised on absolute immunity, however, the district court's denial is immediately appealable because it falls within the collateral order doctrine: "that small class [of orders] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."  Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546,  69 S.Ct. 1221, 1225–26 (1949).

Absolute immunity is an issue of law, separable from the merits of the case, which once denied cannot effectively be preserved for later review by an appellate court.   "[T]he denial of a substantial claim of absolute immunity is an order appealable before final judgment, for the essence of absolute immunity is its possessor's entitlement not to have to answer for his conduct in a civil damages action." Mitchell v. Forsyth, 472 U.S. 511, 525, 105 S.Ct. 2806, 2815 (1985) (ruling on qualified immunity immediately appealable). See also  See also Nixon v. Fitzgerald, 457 U.S. 731, 741–43, 102 S.Ct. 2690, 2697–98 (denial of presidential immunity immediately reviewable on appeal) and Acierno v. Cloutier, 40 F.3d. 597, 606 (3d Cir. 1994): "The Nixon case makes clear that we have appellate jurisdiction to consider whether the former members of the County Council are entitled to absolute legislative immunity."

A district court's denial of summary judgment,  premised on absolute legislative immunity, is therefore immediately appealable.  For this reason, we have jurisdiction to consider the district court's denial of summary judgment with regard to the immunity claims.  Moreover, because absolute immunity is a purely legal question, we exercise plenary review over the district court's decision.  Acierno, 40 F.3d at 609, citing Donivan v. Dallastown Borough, 835 F.2d 486, 487 (3d Cir. 1987) cert. denied495 U.S. 1035, 108 S.Ct. 1596 (1988).

III. Foerster's Individual Claim to Legislative Immunity     According to Foerster, he is entitled in his individual capacity to absolute legislative immunity from suit because of his membership on the Salary Board, the governing body that ultimately approved the elimination of the plaintiffs' positions with the County.  Plaintiffs respond that their complaint does not concern Foerster's vote as a member of the Salary Board but is directed at the actions he took prior to and independent of that vote in order to persuade his department heads to bring about the elimination of their positions.  The parties focussed a great deal of their argument on the question whether the Salary Board acted legisla–

tively or administratively when it voted to do away with the plaintiffs' positions.  We do not find, however, that the status of the Salary Board is the dispositive question of individual immunity in this case.  Rather, the issue is whether Tom Foerster's pre–vote actions as a Commissioner can be separated from his vote as a Salary Board member.

We will start our analysis with an examination of the general principles of legislative immunity and how it applies to

local legislators in § 1983 cases.  Under 42 U.S.C. §1983, "Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected any citizen ... or other person ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  The term "persons" includes local and state officers acting under color of state law.  See Hafer v. Melo, 502 U.S. 21, 112 S.Ct. 358 (1991).  The Supreme Court has recognized, however, that public officials, sued in their individual capacities, may under certain circumstances enjoy immunity from § 1983 suits.  In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783 (1951), the Supreme Court held that the doctrine of legislative immunity, as applied to state legislators, survived the enactment of § 1983.  In Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171 (1971),  the Court extended the doctrine of absolute legislative immunity to members of a regional legislature.  Finally, in Aitchison v. Raffiani, 708 F.2d 96 (3d Cir. 1983), this circuit, following the example of our sister circuits, held that local legislators enjoyed absolute immunity from personal liability under 42 U.S.C. § 1983 for acts taken in their legislative capacities.

In Aitchison, we considered whether a mayor and borough attorney were entitled to immunity for the passage of an ordinance, which abolished the position of building inspector.  We recognized in Aitchison that executive officials might exercise legislative power along with their administrative duties, and we adopted a functional approach to the question of when immunity should apply.  "In appraising the mayor's need for absolute immunity, we look to the function the individual performs rather than his location within a particular branch of government." Aitchison, 708 F.2d at 99.  Using this functional approach, we found that the mayor was entitled to absolute immunity for the act of voting for an ordinance that resulted in the abolition of an employment position.  Because the complaint sought compensation for the mayor's vote and established "active participation by the mayor in the legislative process," the mayor was immune from liability for damages under Section 1983.  Id.

Since Aitchison, we have repeatedly stated that a public official's legislative immunity from suit attaches only to those acts undertaken in a legislative capacity.  "It is only with respect to the legislative powers delegated to them by the state legislatures that the members of local governing boards are entitled to absolute immunity."  Ryan v. Burlington County, New Jersey, 889 F.2d 1286 (3d Cir. 1989); Acierno, 40 F.3d at 610.   In Ryan, 889 F.2d at 1290-91, we devised a two-pronged test for determining whether or not a municipal body's action was "legisla-

tive" or "administrative" in character.  To be legislative, the act must be (1) substantively legislative, such as "policy-making of a general purpose" or "line-drawing"; and (2) procedurally legislati-

ve, such that it is "passed by means of established legislative

procedures".  We refined the first prong of this test in Aciernowhen we held that although the number of persons affected by a given decision might be an important factor in the two-part immunity analysis, it was not dispositive.

Using this same approach, we conclude that Tom Foerster is not entitled to legislative immunity for any non-legislative actions he took to abolish the plaintiffs' positions.  In coming to this conclusion, we will assume, without deciding, that the Salary Board's vote to eliminate plaintiffs' positions was "legislative" in nature.  In addition, we will assume that a legislative body's decision to eliminate a government position,  in contrast to the mere termination of a person's employment, is legislative activity.  See Rataree v. Rockett, 852 F.2d 946 (7th Cir. 1988).  Neverthe-

less, we do not think that such legislative activity by the Salary Board shields Tom Foerster from liability.  As a County Commission-

er, Foerster acted in  various capacities -- legislative, executive and administrative.  In giving a unilateral order to have Brimmeier supporters fired, Foerster would not be engaging in policy-making of general application regarding the expenditure of County funds, but would be making either an executive decision on how the anticipated cutback should be implemented or an administrative decision that certain individuals should be fired.  Actions taken in a executive or administrative capacity are not entitled to absolute immunity.

Plaintiffs have not named the Salary Board in their complaint; neither do they cite Foerster's vote as a Salary Board member as part of their claim.  Rather, they seek restitution for the course of conduct -- harassment, threats, and retaliation -- in which Foerster allegedly engaged prior to and independent of the Salary Board's vote.  Even if the Salary Board's decision was part of a policy to cut waste from the county government, Foerster's conduct, if proven, constituted retaliatory conduct  targeted at specific individuals because of their support for a political adversary.  If Tom Foerster used his position as Commissioner to "punish" county workers for their support of Brimmeier, that abuse of power for personal ends cannot be made "legislative" simply by eliminating plaintiffs' positions instead of firing them outright.  Were the Salary Board nonexistent and Tom Foerster able to eliminate County positions without any legislative approval whatsoever, we have no doubt that he could be held liable under Section 1983.

In addition, we do not think Foerster's actions are necessarily rendered "legislative" by the Salary Board's ultimate vote in favor of eliminating plaintiffs' jobs.  An unconstitutional or illegal course of conduct by county government does not fall within the doctrine of absolute immunity merely because it is connected to or followed by a vote of a county board.  For example, in Bartholomew v. Fischl, 782 F.2d 1148 (3d Cir. 1986), we held that the director of a health bureau created by the cities of Allentown and Bethlehem could maintain an action against the mayor of Allentown for persuading the two city councils to dissolve the health bureau and thereby eliminate the director's position.

Bartholomew brought suit for his dismissal against both the City of Allentown and the mayor. In reversing the district court's dismissal of the case, we stated that the mayor's persuasion of the city council constituted "official city policy" and was sufficient to sustain a claim against the city under Section 1983.

> "Indeed, as Mayor Fischl was powerless to discharge Bartholomew himself, the Mayor's only available means of effecting appellant's termination was to persuade the city council of Allentown, the city's official lawmakers, to dissolve the BiCity Board of Health and the Bureau altogether, thereby eliminating Bartholomew's position. It is this course of conduct that Bartholomew refers to [in his complaint] ...."

Bartholomew, 782 F.2d at 1153. In recognizing Bartholomew's claim against the city, we specifically noted the mayor's role in securing his release, concluding, "Defendant Fischl, as Mayor of Allentown, was certainly a government official with policy-making powers ...."Id. Despite our awareness of Fischl's position as mayor, we did not dismiss Bartholomew's suit against him. Although our holding may not address the question of absolute immunity, it nevertheless supports the principle that an official's executive or administrative actions are separable from actions taken in a legislative capacity. See also Meding v. Hurd, 607 F.Supp. 1088, 1110 n. 28 (D.Del. 1985) (actions of Town Council in terminating the police chief are not legislative merely because termination was achieved by a vote of the council).

Moreover, we reject defendant's assertion that Foerster is entitled to immunity because he could not have caused the plaintiffs to lose their positions without the support of at least two of the three other members of the Allegheny Salary Board. Causation is not an issue in this case at this time. Causation relates to the merits of plaintiffs' claims, not to the question of absolute immunity. The issue of causation is a fact-driven inquiry, requiring the district court to make findings about the role both of Foerster and of the Salary Board in eliminating the plaintiffs' positions. At this stage in the litigation, we lack jurisdiction to consider a factor, such as causation, which goes to the merits of plaintiffs' claims. See Johnson v. Jones, 115 S.Ct. 2151(1995). Although defendant's causation argument may have some bite at a later stage, it has no bearing on the issue of absolute legislative immunity for Foerster's pre-vote activities.

Finally, we are satisfied that our rejection of absolute immunity as applied to Foerster will not, as defendants suggest, open the floodgates for future plaintiffs wishing to attack legislators for their votes on controversial budgeting matters. We hold only that the doctrine of absolute immunity, as it pertains to local legislators, does not shield executive officials from liability for a course of conduct taken prior to and independent of

legislative action, even if those officials were simultaneously members of the local legislative body that ratified the conduct. In a situation similar to the one we considered in Aitchison, disgruntled constituents cannot pursue government officials simply because budgetary constraints or organizational efficiencies have dictated the elimination of a job.  A specific employee can, however, challenge a county executive who misuses public office to get rid of that employee's job because the employee's political activities have displeased the county executive.

IV.  The County's Claim to Legislative Immunity

The district court also held that the Allegheny County and Tom Foerster in his official capacity were not entitled to legislative immunity from suit under Section 1983.  For the reasons set forth below, we will affirm this holding as well.

Our resolution of this issue necessarily begins with the Supreme Court's decision in Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018 (1978).  In Monell, the Court overruled a portion of Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473 (1961), to find municipalities liable as "persons" under Section 1983.  "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983."  Monell, 436 U.S. at 694, 98 S.Ct. at 2037-38 (emphasis supplied).  The phrase "made by its lawmak-

ers," practically forecloses the argument  that the Court meant to leave open the possibility that local governments were entitled to legislative immunity under Section 1983.  In addition, the Court rejected the municipality's argument that it was entitled to absolute immunity "lest our decision that such bodies are subject to suit under §1983 'be drained of meaning.'" Monell, 436 U.S. at 701, 98 S.Ct. at 2041, quoting Scheuer v. Rhodes, 416 U.S. 232, 248, 94 S.Ct. 1683 (1974).   The Court in Monell stopped short of imposing respondeat superior liability on local governments. Its subsequent decisions have, however, steadfastly adhered to the general principle that local governments will be held responsible under § 1983 for their violations of constitutional and federal rights.  As long ago as 1979, the Court in Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171 (1979) extended legislative immunity to regional legislators.  More important for our purposes, the Court also implied in Lake County Estates that the regional governing body had no such immunity, stating: "If the respondents have enacted unconstitutional legislation, there is no reason why relief against TRPA itself [the Tahoe Regional Planning Agency] should not adequately vindicate petitioners' interests."  Id. at 405, 99 S.Ct. at 1179 n. 29 (citations omitted).  This statement alone calls defendants' argument into serious doubt.

Shortly thereafter, in Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398 (1980),  the Court held that municipali-

ties lacked qualified immunity under Section 1983.  Justice Brennan's reasoning in the majority opinion in Owen bears on our

resolution of this case.  First, Brennan noted the language of §
1983, which makes no mention of immunities or any exceptions to the
scope of liability.  "Its language is absolute and unqualified; no
mention is made of any privileges, immunities, or defenses that may
be asserted." Owen, 445 U.S. at 635, 100 S.Ct. at 1398.  Neverthe-

less, the Court conceded, some common law immunities were so fully
entrenched at the time the Civil Rights Act was passed in 1871,
that they were implicitly incorporated into the Act.

The Court then considered whether any type of  immunity
protected local governments in 1871 and found two.  The first, the
distinction between governmental and proprietary acts, was ruled
out as a basis of immunity under § 1983 because it was a form of
sovereign immunity, abrogated by Congress, "the supreme sovereign
on matters of federal law," when it included local governments as
"persons" within the Civil Rights Act's scope of liability.  Id.,
at 647–48, 100 S.Ct. at 1413.  The second doctrine of immunity,
which protected municipalities for "discretionary" activities of a
public or legislative nature, was equally inapplicable because "a
municipality has no 'discretion' to violate the Federal Constitu-

tion; its dictates are absolute and imperative." Id. at 649, 100
S.Ct. at 1414.  Thus, neither doctrine of immunity supported the
City's claim of qualified immunity under § 1983.

The Supreme Court further increased municipal exposure to
liability in Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct.
1292 (1986), when it held that a single decision of a municipal
ity's "properly constituted legislative body" could subject it to
liability under § 1983. Id. at 480, 106 S.Ct. at 1298.  Pembaurleaves
little, if any room, for the argument that the Court meant
to "preserve" municipal legislative immunity.

Recently, in Leatherman v. Tarrant County Narcotics
Intelligence and Coordination Unit, the Supreme Court reinforced
its expansive interpretation of § 1983 liability when it rejected
a district court's heightened pleading standard for suits brought
against local governments.  Referring to Owen and Monell, the Court
declared, "These decisions make it quite clear that, unlike various
government officials, municipalities do not enjoy immunity from
suit – either absolute or qualified – under § 1983."  Leatherman,
113 S.Ct. at 1162.

The Supreme Court's past treatment of local governments
under Section 1983 compels our decision today that Allegheny County
is not entitled to legislative immunity in this case. Were we to
hold in defendants' favor, we fear this doctrine of "legislative
immunity" would cut away the core principle of Monell and Owen:
Local governments, unlike individual legislators, should be held
liable for the losses they cause.  Moreover, a doctrine of
legislative immunity for local governments  might have the
undesirable effect of encouraging a county council to adopt all of
its policies through a series of legislative actions passed by a
newly created "Board" or "Council".

Other policy concerns also support our analysis.  First,
we do not believe local governments face the same mix of perverse
incentives as individual legislators when sued or threatened with

a lawsuit.  When a legislator considers a piece of legislation, we expect him to consider the best interests of the people he serves, not the size of his own wallet.  As the Supreme Court has recog-

nized, "In many contexts, government officials are expected to make decisions that are impartial or imaginative, and that above all are informed by considerations other than the personal interests of the decisionmaker."  Forrester, 484 U.S. at 223, 108 S.Ct. at 542.  If the legislator is held personally liable for suit, however, even the most conscientious public officer will be encouraged to vote against legislation that may be beneficial for the community at large for fear that personal liability will outweigh his genuine interest in helping his constituents.  The public officer will think less about the needs of the city or the county, in order to protect his own monetary and personal interests.  Or, he may even decide to forgo public office altogether.  See Wood v. Strickland, 420 U.S. 308 , 95 S.Ct. 992 (1975).  In sum, the result of personal liability is the chilling of potentially beneficial legislative activity and the distraction of public officials from community matters.  "In this way, exposing government officials to the same legal hazards faced by other citizens may detract from the rule of law instead of contributing to it." Id.

The same concerns do not arise when local governments are held liable for violations under § 1983.  First, city or county liability for constitutional violations only adds to the collective risk of loss that the legislator already should be considering when he decides whether or not to enact a new piece of legislation.  If a county policy causes a constitutional wrong, the county should be made to bear the losses caused by that violation.  As Justice Brennan explained in Owen, the central purpose of the Civil Rights Act was to provide citizens with a remedy against those who had abused state power.  "It hardly seems unjust to require a municipal defendant which has violated a citizen's constitutional rights to compensate him for the injury suffered thereby.  Indeed Congress enacted §1983 precisely to provide a remedy for such abuses of official power."  Owen, 445 U.S. at 654, 100 S.Ct. at 1417.

In addition,  liability on the part of the local governing body may deter future unconstitutional legislation, thereby contributing to the enforcement of constitutional norms within our society. "The knowledge that a municipality will be liable for all of its injurious conduct ... should create an incentive for officials who may harbor doubts about the lawfulness of their intended actions to err on the side of protecting citizens' constitutional rights." Id. at 651-52, 100 S.Ct. at 1416. Efforts to enact legislation that causes harm to the community (including the compensation paid for violation of constitutional rights) should be chilled.

Finally,  because a legislator's own money is not at risk, county liability does not distract the legislator from his job of serving the community's interests.  True, the legislator must contend with lawsuits brought against the county, but that distraction is borne equally by the local populace as a whole (at least in tax dollars) and not by any particular individual.  If  a county council forgoes enactment of legislation because it fears

potential liability for the county under § 1983, its decision reflects a rational calculation that, whatever a given policy's benefits, its risk of liability outweighs its collective benefit to the community. This is exactly the type of reckoning we want to encourage our legislators to make.

Defendants argue, however, that legislative immunity for the county is necessary to protect legislators from judicial inquiry into their motives in enacting legislation. This argument lacks weight given the intent-based inquiry of certain doctrines of Constitutional law. "Developments in federal law over the last 30 years have tied the constitutionality of many types of municipal legislation directly to the purpose and motive of the legislation." Goldberg v. Town of Rocky Hill, 973 F.2d 70, 75 (2d Cir. 1992) (citing cases). For better or worse, lawsuits concerning constitu-

tional matters such as equal protection, the First Amendment, and substantive due process all require judicial inquiry of the legislator's motive. See Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555 (1977) (proof of discriminatory motive necessary to show violation of Equal Protection Clause); Bello v. Walker, 840 F.2d 1124, 1129 (3d Cir. 1988), cert. denied, 488 U.S. 851, 109 S.Ct. 134 (1988) (deliberate and arbitrary government decision, including one "tainted by improper motive," violated developer's substantive due process rights) and Grant v. City of Pittsburgh, __ F.3d __, __ (3d Cir. 1996)(evidence of officer's intent admissible when intent is integral element of underlying constitutional violation). These cases illustrate that judicial inquiry of legislative motive is not per se forbidden. We therefore will not undercut core doctrines of Constitutional law by applying legislative immunity to municipali ties under § 1983.

Finally, we note the uniform manner in which our sister circuits have dealt with this issue. See Berkley v. Common Council of City of Charleston, 63 F.3d 295 (4th Cir. 1995), cert, denied, 116 S.Ct. 775 (1996); Goldberg, 973 F.2d at 70; Reed v. Village of Shorewood, 704 F.2d 943; Kuzinich v. County of Santa Clara, 689 F.2d 1345 (9th Cir. 1982); Hernandez v. City of Lafayette, 643 F.2d 1188 (5th Cir. Unit A May 1981), cert. denied, 455 U.S. 907, 102 S.Ct. 1251 (1982). We know of no circuit that currently accepts the doctrine of municipal legislative immunity under Section 1983.

## IV. Conclusion

For the reasons stated above, we will affirm the district court's judgment against the defendants insofar as it holds that neither Tom Foerster, in his individual or official capacity, nor Alle-

gheny County are entitled to legislative immunity in this case.


Phyllis Carver; Thomas Fox; April Moore; Roberta Rudolph v. Tom Foerster, an individual and Chairman, Allegheny County Commis sioners; County of Allegheny, Appellants, No. 96-3008.

BECKER, Circuit Judge, concurring.

I.

In 1976, over a strong dissent by Justice Powell, the Supreme Court announced its decision in Elrod v. Burns, 427 U.S. 347 (1976), holding that the First and Fourteenth Amendments prohibit the dismissal of certain government employees on the basis of political affiliation.  In Branti v. Finkel, 445 U.S. 507 (1980), over a similar Powell dissent, the Court clarified Elrod by making clear that: (1) Elrod prohibits dismissal on the basis of party affiliation even if the discharged employee cannot show that he or she was coerced into changing his or her politi cal allegiance; and (2) government employees can be dismissed for their party affiliation only when the government can show that certain political beliefs are necessary to carry out the duties of those offices.  Then, in Rutan v. Republican Party of Illi nois, 497 U.S. 62 (1990), the Court extended the Elrod principle to include hiring as well as firing.  But Justice Scalia, un daunted by a decade and a half of Elrod's hegemony, wrote a powerful dissent, building upon the words of Justice Powell, and assailing the Elrod-Branti-Rutan trilogy as not only amounting to bad constitutional law, but also as reflecting a deep misunder standing of the essential role that the patronage system has played in American history and political tradition.

As this recitation suggests, the view that the Elrod- Branti-Rutan trilogy was a serious mistake will not die.  That it will not is, I suspect, because of the compelling logic of the Powell and Scalia arguments, described infra, as well as the fact that the total domination of election campaigns by money and special interests that we have seen in recent years not only adds fuel to the fire of the Powell and Scalia arguments, but renders them prophetic.  The need to reexamine the trilogy, which is what I will argue for, is thus counseled by new developments in the years since the trilogy was complete.  The need is doubled in spades by the extreme result in the present case.

The "extreme result" is that the majority has been led by the Elrod trilogy to rule, in effect, that any political leader who advises his political associates to discharge a political opponent may be subject to suit under 42 U.S.C. § 1983 for a First Amendment violation.  Although the present defendant, "Boss" Foerster, is a public official and a member of the Salary Board, under the majority's logic, Foerster would be liable as a § 1983 co-conspirator if he were a private citizen-political boss who gave the same "orders" he is charged with giving here, to me a quite startling proposition.  This result causes me to question whether there is now any limit to examination in the courts or under the aegis of the courts (through depositions and interroga tories) of any government personnel or procurement decision that gores the ox of someone who can claim political foul.  And, query whether there is any limit to the judicial examination of the mental processes and conversations of defendants in such cases. If there is not, the fundamental premise of representative government -- that it is our public officials who are held accountable for their actions at the ballot box rather than their political "bosses" -- seems not only challenged, but also under

mined.

The 1996 election campaigns were startling in the extent to which the influence of money and special interest groups so clearly dwarfed the role of the political parties in affecting the outcomes. But this is the very specter that loomed so large in the sights of Justice Powell when he decried the results in Branti:

> Particularly in a time of growing reliance upon expensive television advertisements, a candidate who is neither independently wealthy nor capable of attracting substantial contributions must rely upon party workers to bring his message to the voters. In contests for less visible offices, a candidate may have no efficient method of appealing to the voters unless he enlists the efforts of per sons who seek reward through the patronage system. Insofar as the Court's decision today limits the ability of candidates to present their views to the electorate, our democratic process surely is weakened.

Branti, 445 U.S. 528-29 (Powell, J., dissenting). As the foregoing comments suggest (and as I will elaborate), I see the trilogy as extremely deleterious to the national polity. That is because it has seriously undermined certain traditions that have helped our democracy to flourish.

I recognize that I am a judge of an inferior court, but that does not preclude me from expressing an opinion where I feel strongly that the Supreme Court has gone down a dangerous path it ought to reconsider. U.S. v. Kennerley, 209 F. 119, 120 (S.D.N.Y. 1913) (Hand, J.) ("While, therefore, the demurrer must be overruled, I hope it is not improper for me to say that the rule as laid down, however consonant it may be with mid-Victorian morals, does not seem to me to answer to the understanding and morality of the present time.").

Thus, although I am constrained by the Supreme Court's jurisprudence to concur in the present opinion and judgment, and therefore do so, I write separately to express my dismay about the way in which the First Amendment patronage jurisprudence has evolved. This opinion is energized by the scenario of the case at bar and the recent developments to which I have adverted.

## II.

I begin with a description of the problem clearly identified by the Powell and Scalia dissents. In essence, the patronage system historically has been critical to the survival and strength of political parties by allowing party leaders to reward their party faithful. Strong parties have, in turn, played a crucial democratizing role: they have stimulated political activity and encouraged meaningful political debate; they have enabled local candidates for office to attract attention to their candidacies and galvanize grass-roots organizing; and they have facilitated the political participation of historically excluded groups, see Rutan, 497 U.S. at 108 (Scalia, J., dissenting) ("By supporting and ultimately

dominating a particular party 'machine,' racial and ethnic minorities have -- on the basis of their politics rather than their race or ethnicity -- acquired the patronage awards the machine had to confer.").

Moreover, as Justice Scalia noted in Rutan, the "patronage system does not . . . merely foster political parties in general; it fosters the two-party system in particular." Id. at 106. If patronage jobs are available to workers who have chosen a winning candidate, campaign workers are more likely to choose a party with a chance of prevailing, rather than one with non-mainstream views. This tends to foster the preservation of the two-party system, as parties must ensure that their message has wide appeal to attract rank-and-file members.

As I see it, the Elrod trilogy has deprived parties of one of the most effective tools for building party unity: prospect of future political jobs for a job well done. The blow that this has dealt patronage systems has contributed to the need of political candidates to rely almost exclusively on media and money-intensive campaigns to succeed. That politics has come to be dominated by money, and hence large contributors and political action committees (PACs) have achieved a significant sway, has been true for a number of years now, but it surely cannot be doubted in the wake of the 1996 election campaigns. This effect has been felt most significantly at the local level, where candidates, particularly challengers who have no PAC money to draw on, can generate little support. Without personal wealth, such candidates are doomed to failure. See Branti, 445 U.S. at 528-29 (Powell, J., dissenting). I, of course, do not mean to suggest that the trilogy is the only reason for the massive influence of money in election campaigns, nor could I credibly do so given the ascendency of the mass media over so many aspects of national life, and the high cost of media advertising. But, it is at least a significant contributing factor.

Additionally, although the rise of modern, media-intensive campaigns has surely benefitted the democratic process by allowing some candidates to make broad-based appeals to the entire public, access to the media is limited to those candidates who can afford it, a terrible state of affairs. Moreover, the nature of modern campaigns has not rendered obsolete the crucial work done by individual party workers, particularly in local races. "Certainly they have not made personal contacts unnecessary in campaigns for the lower level offices that are the foundations of party strength, nor have they replaced the myriad functions performed by party regulars not directly related to campaigning. And to the extent such techniques have replaced older methods of campaigning (partly in response to the limitations the Court has placed on patronage), the political system is not clearly better off." Rutan, 497 U.S. at 105 (Scalia, J., dissenting).

The decline of the patronage system has had other significant consequences for the character of the electoral process. The weakening of the party system affects the ability of voters to make educated choices among candidates, as voters with little information about candidates historically have looked

to their party for cues.  "With the decline in party stability, voters are less able to blame or credit a party for the performance of its elected officials.  Our national party system is predicated upon the assumption that political parties sponsor, and are responsible for, the performance of the persons they nominate for office."  Branti, 445 U.S. at 531 (Powell, J., dissenting).  Weaker parties also adversely affect citizen participation in the democratic process.  Contrast the appalling national turnout of 48% in the 1996 presidential election, notwithstanding the vaunted impact of motor-voter registration laws, with the much higher turnout in years past when the political parties were stronger.  That in itself is an ominous sign.

The deleterious impact of special interest money does not lessen after election day, as has often been noted.  According to Justice Scalia, "[t]he replacement of a system firmly based in party discipline with one in which each officeholder comes to his own accommodation with competing interest groups produces 'a dispersion of political influence that may inhibit a political party from enacting its programs into law.'"  Rutan, 497 U.S. at 107-08 (Scalia, J., dissenting) (quoting Branti, 445 U.S. at 531 (Powell, J., dissenting)).  Additionally, as the decline in party strength hastens the rise of special interest groups, which are necessarily focused on narrow issues, government suffers because "candidates and office-holders are forced to be more responsive to the narrow concerns of unrepresentative special interest groups than to overarching issues of domestic and foreign policy."  Branti, 445 U.S. at 532 (Powell, J., dissenting).  Such ills, fostered by the dominance of money in elections, can only grow more significant, as each election brings more expensive campaigns.

In a similar vein, Justice Powell explained that "[s]trong political parties aid effective governance after election campaigns end.  Elected officials depend upon appointees who hold similar views to carry out their policies and administer their programs.  Patronage . . . serves the public interest by facilitating the implementation of policies endorsed by the electorate."  Id. at 529.

It is also clear to me that the premise of Branti -- that the accountability of elected officials to the voters is satisfied by exempting policy making officials from Elrodscrutiny -- is not sound.  Anyone with experience in government knows that officials of lower rank can undermine the policies of an administration just as effectively as higher ranking persons.  Indeed, commentators have recognized that the Supreme Court has drawn a distinction between "partisan" patronage employees and "politically-neutral" civil servants.

According to one article, "[t]here is no empirical basis for this distinction.  Highly protected career bureaucrats, who have strong ideological attachments to political causes or policies may also be motivated by partisan objectives, and these objectives can be inconsistent with the goals of elected officials.  In reaching its conclusion, the Court ignores the agency problems faced by politicians in securing the compliance

of government workers in molding and administering policy."
Ronald N. Johnson & Gary D. Libecap, Courts, a Protected
Bureaucracy, and Reinventing Government, 37 Ariz. L. Rev. 791,
820-21 (1995) (footnotes omitted).

At the same time, the regime of the trilogy has created
widespread uncertainty among government officials as to the
legality of hiring and firing certain government employees.  The
line between who can be discharged for political affiliation and
who cannot under Branti is less than pellucid, to say the
least.  This has required time-consuming and ongoing training
of management-level government employees lest they run afoul of
its precepts.  In my view, Justice Powell was right when he said
that "[a] constitutional standard that is both uncertain in its
application and impervious to legislative change will now control
selection and removal of key government personnel.  Federal
judges will now be the final arbiters as to who federal, state,
and local governments may employ. . . . [T]he Court is not
justified in removing decisions so essential to responsible and
efficient governance from the discretion of legislative and
executive officials."  Branti, 445 U.S. at 525-26 (Powell, J.,
dissenting).

I acknowledge, of course, that I have not made an
empirical study of the impact of the Elrod trilogy, but a survey
of the literature reveals no satisfactory data.  On a matter
such as this, I believe that seasoned judgment of those with
experience in the political process is the best guide.  Moreover,
I share Justice Scalia's view that to "oppose our Elrod-
Brantijurisprudence, one need not believe that the patronage system is
necessarily desirable; nor even that it is always and everywhere
arguably desirable; but merely that it is a political arrangement
that may sometimes be a reasonable choice, and should therefore
be left to the judgment of the people's elected representatives."
Rutan, 497 U.S. at 110 (Scalia, J., dissenting).

### III.

I do not claim that the patronage system is without
flaw.  The abuses of the system have been well documented over
the years.  But while patronage systems have their faults, the
damage that the Elrod trilogy has done to the polity weighs, on
balance, in favor of permitting elected officials to hire and
fire based on political affiliation.  Moreover, what is too often
forgotten is that most patronage appointees--whether maintenance
employees of municipalities, county clerks, or federal judges--
perform honorably and well.  And when they do, they bring credit
upon the party that had them appointed and justify support
therefor.  While a distinction is often made between patronage
and merit appointment, patronage employees are, far more often
than not, true merit employees.  The problems of the patronage
system can be dealt with, and historically have been dealt with,
through civil service reform and other measures, rather than
through constitutional litigation.

Turning to that aspect of the matter, as Justice Powell
noted in his Elrod dissent, the "judgment today unnecessarily
constitutionalizes another element of American life -- an element
certainly not without its faults but one which generations have

accepted on balance as having merit."  Elrod, 427 U.S. at 389 (Powell, J., dissenting).  I am also concerned by the proliferation of Elrod-generated litigation (an on-line review reflects that Elrod has now been cited 1249 times by federal courts alone), which is now extending rapidly to procurement decisions, such as the award of towing contracts, in addition to personnel decisions.  See O'Hare Truck Serv., Inc. v. City of Northlake, 116 S. Ct. 2553 (1996).  The growing number of Elrod-based cases has imposed a burden on federal trial and appellate courts, embroiling them in the time-consuming and often quite difficult exercise of divining where a duty is sufficiently policy oriented to except an employee from Elrod scrutiny.

In sum, given the sea change in politics, even since Rutan, characterized primarily by the decline of political parties and the dominance of elections by money, I submit that it is time for the Supreme Court to revisit this area of the law.

It seems that the import of the majority's discussion on causation is that, if the fact-finder determines that the Salary Board would have itself decided to eliminate plaintiffs' positions, Foerster must be absolved.  Perhaps I am incorrect. At all events, the plaintiffs' claim should really be cut off at the pass, i.e. now.  I lament that it cannot be, but hope that the Supreme Court will accept Justices Powell and Scalia's wisdom.  As Justice Frankfurter once stated, "Wisdom too often never comes, and so one ought not to reject it merely because it comes late."  Henslee v. Union Planters Bank, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).